**In re R. BASTYR AND ASSOCIATES, INC., Debtor.**

Bankruptcy No. 4–86–1144.

United States Bankruptcy Court, D. Minnesota.

Jan. 14, 1988.

Robert R. Roos, Bradley R. Janzen, Minneapolis, Minn., for creditor.

James H. Levy, Minneapolis, Minn., for debtor.

MEMORANDUM ORDER
DETERMINING CLAIM
NUMBER 38

ROBERT J. KRESSEL, Chief Judge.

This case came on for hearing on the debtor's objection to claim number 38 filed by Centurion Company. James H. Levy appeared for the debtor. Robert R. Roos and Bradley R. Janzen appeared for Centurion Company. This court has jurisdiction pursuant to 28 U.S.C. §§ 157 and 1334, and Local Rule 103(b). This is a core proceeding under 28 U.S.C. § 157(b)(2)(B). Based on the evidence, memoranda of counsel, and the file of this case, I make the following:

## MEMORANDUM ORDER

R. Bastyr and Associates, Inc. is the debtor in a chapter 11 case filed on April 16, 1986. Centurion Company is a creditor in the case, and has filed a proof of claim for $327,563.85. The debtor filed an objection to the claim disputing the amount of the debt and alleging a setoff based on a theory of unjust enrichment.

This is the second of two related claim objections.[1] The first objection concerned Cheyenne Land Company's claim for $25,-305.00. The claim related to repairs and warranty work on homes that the debtor built in the Aspenwood development, one of several construction projects between the parties. On November 6, 1987, I entered an order disallowing Cheyenne's claim concluding that the course of conduct between the parties established that Cheyenne, not the debtor, was responsible for the repairs. *In re R. Bastyr and Associates, Inc.,* Bktcy. No. 4-86-1144, slip op. at 5-6 (Bktcy.D.Minn. Nov. 6, 1987).

This objection involves the claim of Centurion Company. It consists of several categories of expenses:

| Category | Description | Amount |
|---|---|---|
| A | Invoices of the debtor paid by Centurion. | $214,093.83 |
| B | Advances to the debtor in excess of costs on completed homes. | $47,157.38 |
| C | Advances to the debtor in excess of costs on uncompleted lots. | $42,905.85 |
| D | Repairs made by Centurion to Cherry Hill homes (foundation work). | $13,000.00 |
| E | Repairs made by Centurion to home at 18719 Red Cherry Circle. | $3,565.26 |
| F | Repairs made by Centurion to home at 18600 Clearview. | $6,841.53 |
| | Total | $327,563.85 |

On September 25, 1987, the parties stipulated that category A should be allowed in the amount of $139,338.99, category B in the amount of $47,157.38, and category C in the amount of $42,905.85. On November 25, 1987, I allowed Centurion to amend its claim by $11,150.00—the amount of a mechanic's lien judgment arising out of the Cherry Hill development. On December 11, 1987, the debtor stipulated to the amount of the amended claim as $11,150.00 and agreed to increase the previously stipulated amounts in categories A, B, and C.[2] Therefore, the total amount of the agreed claim is $240,552.22 ($139,338.99 + $47,-157.38 + $42,905.85 + $11,150.00). The balance of Centurion's claim, consisting of categories D, E, and F for a total of $23,-406.79 ($13,000.00 + $3,565.26 + $6,841.53), remains in dispute.

In addition to its objection to the amount of Centurion's claim, the debtor asserts a right of setoff for specific payments the debtor made for construction costs, and for unjust enrichment. If proven, the setoffs would reduce Centurion's claim. 11 U.S.C. § 502(b)(1). Centurion agreed to the construction cost setoff for $27,500.00 pursuant to a December 11, 1987, stipulation. The setoff for unjust enrichment relating primarily to work performed by the debtor on the Cherry Hill development has not been settled. The total claimed setoff that the debtor seeks to establish is $194,500.00.

In summary, the parties have agreed that categories A, B, and C of Centurion's claim totalling $240,552.22 is allowable, and that the debtor has a valid setoff of $27,-500.00 against that claim. There remains in dispute categories D, E, and F totalling $23,406.79, and the debtor's alleged right of setoff for unjust enrichment totalling $194,500.00.

### I.

R. Bastyr and Associates, Inc. is a Minnesota corporation in the business of land planning and home construction. Up until the summer of 1985, the corporation operated as two separate entities. R. Bas-

---

1. The debtor also objected to claim number 36 of Cheyenne Land Company. Cheyenne Land Company developed the Aspenwood project and Centurion Company developed the Cherry Hill project.

2. Although Centurion has not filed an amended claim and technically is not entitled to the increased amount, I will treat the $11,150.00 debt as part of the allowed claim, since the debtor has agreed to the increase.

tyr and Associates, Inc. did the land planning work, and Copperfield Homes, Inc. supervised the construction of new homes. Both corporations were owned and operated by Ronald L. Bastyr and his wife, Adrian J. Bastyr. On July 23, 1985, the two companies merged to become R. Bastyr and Associates, Inc., the debtor in this Chapter 11 case.[3]

The business relationship between Ronald Bastyr and Richard Neslund began back in 1983. Bastyr's corporations worked on several of Neslund's housing projects. Although the claim that is the subject of this dispute relates primarily to the Cherry Hill project, some discussion of the Aspenwood project is necessary to fully understand the parties' relationship.

The Aspenwood project involved the development of eight residential lots. Cheyenne Land Company, which is operated by Neslund,[4] purchased the real estate at a tax foreclosure sale. R. Bastyr and Associates did the land planning for the project, and Copperfield Homes constructed the seven rental units which comprised Aspenwood.

The precise details of the agreement between the parties is not clear since there was never a written contract. However, it is clear that Ronald Bastyr, through his corporations, was responsible for the land planning services and construction of the homes. His duties included: designing the house floor plans, hiring contractors to complete the construction, and various other tasks. For their services, Copperfield

Homes received $3,000.00 per unit for construction, and R. Bastyr and Associates received $1,000.00 per lot for land planning.[5] Cheyenne Land Company was responsible for all the costs of construction and engineering, including the cost of warranty work.[6]

The Cherry Hill project was much larger. Centurion Company acquired the Cherry Hill property at a tax foreclosure sale on June 17, 1983, for approximately $515,-000.00. Initially, Centurion planned to resell the property to a third party shortly after purchasing it. Bastyr had located a buyer and arranged a tentative sale. However, the resale was never consummated, and after subsequent attempts to sell the property also failed, Centurion decided to develop the land.

As with the Aspenwood project, Neslund contacted Bastyr to assist in the development. Acting this time on behalf of Centurion Company, Neslund orally contracted with R. Bastyr and Associates to perform preconstruction services. Those services included: (1) surveying and plotting the lots, (2) lowering the floodplain to increase the amount of usable land, (3) negotiating with the city to change the zoning restrictions, and (4) supervising other professionals in developing the land.[7] Throughout the preconstruction phase, Centurion paid all of R. Bastyr and Associates costs, except the wages of its employees.

After the land planning work was completed, Centurion contracted with Copper-

---

**3.** In order to avoid confusing the different entities, I will refer to the merged corporation as the debtor, and the two former corporations by name.

**4.** It is not clear whether Neslund had an ownership interest in Cheyenne Land Company or Centurion Company. However, he undoubtedly had authority to act on behalf of the corporations.

**5.** There is some dispute as to whether R. Bastyr and Associates was compensated for its land planning work on Aspenwood. The debtor claims that it was not paid for land planning, but rather, that work was done as part of its consideration for the right to build homes in the Cherry Hill development. However, I find that the debtor's claim is not supported by the evi-

dence. A February 19, 1986, billing indicates that the debtor received $8,000.00 ($1,000.00 per lot) for its land planning services on the Aspenwood project.

**6.** There was a substantial amount of warranty work that needed to be done on Aspenwood homes. Cheyenne Land Company filed a claim for the cost of that work. Because Cheyenne's claim was addressed in a separate order dated November 6, 1987, the facts concerning the warranty work need not be repeated in this order.

**7.** R. Bastyr and Associates hired several professionals to assist in the preconstruction planning, such as engineers, landscape architects, and soil consultants. The total cost of these services was around $175,000.00. All were paid by Centurion.

field Homes to build multi-family and single-family units. The August 1, 1984, agreement provided that Copperfield Homes would supervise the design, layout, and construction of the units. Although Copperfield Homes did much of the design work itself, other subcontractors did the actual construction.[8]

As compensation for its services, the debtor received $4,000.00 per unit constructed. Of that amount, $3,000.00 went to Copperfield Homes for services rendered in supervising the actual construction of the units, collecting all the bills from subcontractors, attending the closings, and other services necessary to facilitating the construction and sale of the units. The remaining $1,000.00 went to R. Bastyr and Associates for preconstruction services. R. Bastyr and Associates also received a $52,000.00 lump sum payment at the outset of the project.[9]

All the costs incurred by Copperfield Homes in designing and constructing the units was paid by Centurion. Money was advanced to Copperfield Homes on a regular basis to fund the construction and pay for materials.

In late February 1986, a problem arose with the payment of subcontractors. Over $350,000.00 in funds advanced to Copperfield Homes to cover construction costs was never paid, and several builders and suppliers filed mechanic's lien claims against Cherry Hill homes. After investigating the situation, Centurion learned that Ronald Bastyr had diverted the money for his own personal use, and therefore, Copperfield Homes could not pay the construction bills as they came due. In order to satisfy the liens on the property, Centurion advanced additional funds to pay the subcontractors.

On April 16, 1986, the debtor filed this chapter 11 case. At the time of filing, it had completed 56 of the 176 units in the Cherry Hill development. On May 5, 1986, the debtor, with court approval, assigned the remaining interest in the August 1, 1984, construction contract back to Centurion as part of a comprehensive settlement between the parties.

On August 29, 1986, Centurion Company filed a proof of claim for $327,563.85. The debtor objected to the claim on October 8, 1987.

## II.

The debtor raises two issues with respect to Centurion's claim. The first issue is a claim objection relating to the costs of warranty work on the Cherry Hill project as set forth in categories D, E, and F of Centurion's claim. The debtor argues that it is not liable for the costs of the warranty work, and therefore, Centurion is not entitled to reimbursement for those expenses.

The second issue the debtor raises concerns an alleged setoff for unjust enrichment.[10] There are four elements of the

---

**8.** With respect to defects in construction, the August 1st agreement provided:

> Copperfield agrees to indemnify and hold Centurion harmless for and on account of any and all claims by third parties as against Copperfield and/or Centurion arising out of the construction and sale of residential homes on the Cherry Hill site, including, but not limited to, warranties as to construction and/or materials and/or enjoyment of the residences and/or design and/or representations made by agents and representatives of Copperfield, including the sales personnel loaned to Copperfield by Centurion and/or financing agents.

In practice, however, Centurion reimbursed Copperfield Homes for the cost of warranty work. The course of conduct was much like that between Copperfield Homes and Cheyenne Land Company in the Aspenwood project.

**9.** The debtor claims that the $52,000.00 represented a finder's fee for locating the Cherry Hill real estate, and was not compensation for land planning work. While the parties may have contemplated some sort of finder's fee in the initial stages of the deal, when and if the property was resold, I find that the understanding changed when Centurion could not resell the property and decided to develop it. The evidence clearly shows that the $52,000.00 payment was compensation for R. Bastyr and Associates' land planning services.

**10.** The debtor argues that it is entitled to offset its claim for unjust enrichment pursuant to 11 U.S.C. § 553. However, § 553 deals only with a creditor's right of setoff. A debtor's right of setoff is established under state law and § 502 of the Bankruptcy Code. *See* 11 U.S.C. § 502(b)(1).

setoff: $62,500.00 as a finder's fee on the Aspenwood project, $120,000.00 for land planning services on unbuilt lots in the Cherry Hill project, $7,000.00 for foundation work on partially completed homes in Cherry Hill, and $5,000.00 for land planning services on additional lots in the Cherry Hill project.[11] The total claimed setoff is $194,500.00. I will address each issue raised by the debtor separately.

### (A) *Objection as to Claim for Warranty Work*

■ The first issue raised is whether the debtor is liable for repairs and warranty work on Cherry Hill Homes. The August 1, 1984, agreement provided:

> Copperfield agrees to indemnify and hold Centurion harmless for and on account of any and all claims by third parties as against Copperfield and/or Centurion arising out of the construction and sale of residential homes on the Cherry Hill site, including, but not limited to, warranties as to construction and/or materials and/or enjoyment of the residences and/or design and/or representations made by agents and representatives of Copperfield, including the sales personnel loaned to Copperfield by Centurion and/or financing agents.

Clearly, the terms of the written agreement placed the liability for repairs and warranty work on the debtor. I find, however, that the subsequent conduct of the parties modified the written agreement so as to shift liability to Centurion.

It is well settled in Minnesota that a written agreement may be modified by subsequent acts of the parties. *Mitchell v.*

*Rende,* 225 Minn. 145, 150, 30 N.W.2d 27, 31 (1947), *citing, Dwyer v. Illinois Oil Co.,* 190 Minn. 616, 619, 252 N.W. 837, 838 (1934). *See also Wolpert v. Foster,* 312 Minn. 526, 254 N.W.2d 348, 352 (1977). For example, in *Wolpert v. Foster* the Minnesota Supreme Court upheld the trial court's finding of an implied agreement to pay interest. 254 N.W.2d at 352. The Supreme Court reasoned that the defendant's continued dealings with the plaintiff, after being informed of the plaintiff's intention to charge interest, created a binding modification of the written contract. *Id.*

However, it is also well settled that a parol modification must be proved by clear and convincing evidence rather than a mere preponderance of the evidence. *Merickel v. Erickson Stores Corp.,* 255 Minn. 12, 15, 95 N.W.2d 303, 305 (1959); *Hentges v. Schuttler,* 247 Minn. 380, 383, 77 N.W.2d 743, 746 (1956); *Kavanagh v. The Golden Rule,* 226 Minn. 510, 516, 33 N.W.2d 697, 700 (1948). The purpose for imposing a higher standard of proof is to protect parties against fraudulent claims. *Hentges,* 77 N.W.2d at 746. It is all too easy for a party to claim that a written contract has been modified.

■ In this case, the conduct[12] of the parties establishes a contract modification by clear and convincing evidence. Throughout the construction phase on both the Aspenwood and Cherry Hill projects, Centurion continually reimbursed the debtor for the costs of repairs and warranty work. Essentially, the debtor worked for Centurion on a cost-plus basis. There is no evidence to suggest that Centurion ever

---

11. The original plan for the Cherry Hill development called for 176 units. The debtor argues that it was to receive $1,000.00 for land planning work on those lots pursuant to the August 1, 1984, contract (i.e. $3,000.00 for construction and $1,000.00 for preconstruction work, totalling $4,000.00 per unit). There were 56 units completed before the debtor signed the August 1st agreement. The claim for $120,000.00 reflects the total land planning claim for the remaining 120 units. The claim for $7,000.00 represents construction, as opposed to land planning, costs for seven additional lots. Finally, the debtor claims that the total number of units increased from 176 to 181 some time after the construction project began, and therefore, it

is entitled to $5,000.00 for land planning services on the extra five units.

12. The parties' conduct evidences only the requisite assent to the modification. To be binding, the modification also must be supported by adequate consideration. Here, the original consideration would attach to the modification and make it binding. *See Asbestos Products, Inc. v. Healy Mechanical Contractor, Inc.,* 306 Minn. 74, 235 N.W.2d 807, 809 (1975) (if the modified contract is still executory, the original consideration is sufficient); *Breza v. Thaldorf,* 276 Minn. 180, 182, 149 N.W.2d 276, 279 (1967).

demanded payment for the work until after the debtor filed bankruptcy. In fact, it is likely that the quoted language was boilerplate and that neither party knew of it or operated under it until this dispute arose. Under the circumstances, I find that the contract was modified so as to transfer liability for repairs and warranty work to Centurion.[13]

### (B) *Setoff for Unjust Enrichment*

■ The second issue raised by the debtor is whether Centurion has been unjustly enriched. At the outset, it is important to define the nature of an action for unjust enrichment, and how it differs from other contractual actions. A contract may be either express, implied in fact, or implied in law. 66 Am.Jur.2d *Restitution and Implied Contracts* § 19 (1964). An express contract is an oral or written agreement. A contract implied in fact is one which arises from the facts and circumstance of each case. Although the parties never "express" an intention to be bound, their conduct evidences the requisite intent.[14] *See Roberge v. Cambridge Coop. Creamery Co.*, 248 Minn. 184, 79 N.W.2d 142 (1956) (contracts implied in fact require a meeting of the minds the same as express contracts). A contract implied in law, or quasi-contract, is of a completely different nature. It arises by operation of law to prevent the unjust enrichment of one party at the expense of the other. *Stemmer v. Estate of Sarazin*, 362 N.W.2d 406, 408 (Minn.Ct.App.1986).

■ In this case, the debtor's claimed setoff is based on an implied in law contract.[15] It alleges that Centurion will be unjustly enriched if it is not required to pay additional money for services it rendered on the Aspenwood and Cherry Hill projects. However, I find no basis for imposing quasi-contractual liability [16] on Centurion under the circumstances of this case. There are three independent reasons for my decision.

First, because there was an express contract between the parties covering the work performed, the debtor is precluded from recovering quasi-contractual damage. "[W]here there is an express contract, there can be no contract implied in fact or quasi-contractual liability with respect to the same subject matter." *Schimmelpfennig v. Gaedke*, 223 Minn. 542, 548, 27 N.W. 2d 416, 420 (1947). *See also Sharp v. Laubersheimer*, 347 N.W.2d 268, 271 (Minn.1984) (trial court erred as a matter of law in awarding quantum meruit in conflict with an express agreement); *Breza v. Thaldorf*, 276 Minn. 180, 183, 149 N.W.2d 276, 279 (1967) (proof of an express contract precludes quantum meruit recovery); *Roberge v. Cambridge Coop. Creamery Co.*, 248 Minn. 184, 197, 79 N.W.2d 142, 150

---

**13.** Centurion cites *Wabasha State Bank v. Caldwell Packing Co.*, 308 Minn. 349, 251 N.W.2d 321 (1976), for the proposition that a written contract cannot be modified by the parties' course of dealing. However, *Caldwell Packing* is not controlling on the issue in this case. That case dealt with a contract that was within the scope of Minnesota's Uniform Commercial Code. Section 336.1-205(4) provides:

The express terms of an agreement and an applicable course of dealing or usage of trade shall be construed wherever reasonable as consistent with each other; but when such construction is unreasonable express terms control both course of dealing and usage of trade and course of dealing controls usage of trade.

Minn.Stat. § 336.1-205(4) (1986). Although *Caldwell Packing* correctly states the law with respect to contracts under the Uniform Commercial Code, the contract in this case is not subject to those provisions.

**14.** A typical example of a contract implied in fact can be illustrated by a person who walks into a barber shop and sits down in the chair for a haircut. Although the barber and the patron never expressly form a contract, their conduct manifests an intention to be contractually bound. As a result, the barber is entitled to the reasonable value of the haircut based on an implied in fact contract.

**15.** The debtor's trial memoranda suggests that there was an express agreement to pay a finder's fee for the Aspenwood property which constitutes the basis of its claim for $62,500.00. I find no evidence to support such a claim. Moreover, to the extent that there was an agreement, the debtor acknowledges that it gave up its right to a finder's fee in consideration for the August 1, 1984, contract to build homes at Cherry Hill.

**16.** An action to recover the reasonable value of services performed based on a contract implied in law, is referred to as an action for quantum meruit.

(1956) (recovery on a theory of quasi-contract permitted where there is no express or implied contract, and it would be unjust to allow one party to receive the benefit of the other party's services).[17]

Here, there were two express contracts covering the work that the debtor seeks compensation for. There was an oral contract between Centurion and R. Bastyr and Associates for preconstruction work, and a written contract between Centurion and Copperfield Homes for the actual construction of the units. The fact that the debtor chose to assign its contractual rights back to Centurion shortly after filing for bankruptcy does not now give it a right to sue Centurion on a quasi-contractual basis. To the contrary, the assignment of its contractual rights is further support for denying the debtor equitable relief. *See Kosbau v. Dress,* 400 N.W.2d 106, 110 (Minn.Ct.App. 1987) (a party is bound by an election of remedies where a chosen course of action is taken to a determinative conclusion and the other party has incurred some damage).

The second reason the debtor's claim must fail is that there is no unjust enrichment. The Minnesota Supreme Court elaborated on the requirement of unjust enrichment in *First Nat'l Bank v. Ramier,* 311 N.W.2d 502 (Minn.1981). "[U]njust enrichment claims do not lie simply because one party benefits from the efforts or obligations of others, but instead it must be shown that a party was unjustly enriched in the sense that the term 'unjustly' could mean illegally or unlawfully." *Id.* at 504. In *Ramier,* a bank loaned the defendant's husband $50,000.00 on an unsecured basis. Shortly thereafter, the husband died and the bank brought an action against the decedent's estate claiming that his surviving spouse would be unjustly enriched if a constructive trust were not imposed on the loaned funds. *Id.* at 503. The court found that the decedent's spouse had not been unjustly enriched, reasoning that the bank "could have either required security for the loan or obtained the signature on the promissory note of the potential joint tenant of the property." 311 N.W.2d at 504.

Although the court in *Ramier* seems to suggest that unjust means unlawful, this is not generally the rule in Minnesota. "[A]n action for unjust enrichment may be based on failure of consideration, fraud, mistake, and situations where it would be morally wrong for one party to enrich himself at the expense of another." *Anderson v. Delisle,* 352 N.W.2d 794, 796 (Minn.Ct.App. 1986). *See also Timmer v. Gray,* 395 N.W.2d 477, 478 (Minn.Ct.App.1986); *Park–Lake Car Wash, Inc. v. Springer,* 394 N.W.2d 505, 514 (Minn.Ct.App.1986). However, unjust enrichment will not be awarded simply because a party made a bad bargain. *Cady v. Bush,* 283 Minn. 105, 166 N.W.2d 358 (1969); *Galante v. Oz, Inc.,* 379 N.W.2d 723 (Minn.Ct.App.1986); *Gatz v. Frank M. Langenfeld and Sons Constr., Inc.,* 356 N.W.2d 716 (Minn.Ct. App.1984).

In this case, the debtor has not proven that Centurion has been unjustly enriched. With respect to the debtor's claim for $62,-500.00 as a finder's fee on the Aspenwood property, there is no evidence to show that Centurion and/or Cheyenne Land Company profited from the debtor's work. In fact, most of the evidence suggests that the project is losing money. There were substantial problems with the foundations of the homes, and many remain unrented.

The debtor also failed to prove that Centurion will be unjustly enriched from the work performed on the Cherry Hill project. The testimony indicated that the reasonable value of the debtor's land planning services ranged from $18,100.00 ($100.00 per unit × 181 units) to $90,500.00 ($500.00 per unit × 180 units).[18] The debtor re-

---

17. The court in *Roberge* noted one exception to the rule. An express contract is not a bar to recovery on a theory of quantum meruit where there is a breach of contract by one party and the other party chooses to rescind the contract and recover in quantum meruit. *Roberge v. Cambridge Coop. Creamery Co.,* 248 Minn. 184, 197, 79 N.W.2d 142, 150 (1956). However, there is no evidence in this case to support a claim by the debtor for breach of contract.

18. Ronald Bastyr testified that the value of the land planning services, which differs from the estimates above which only calculate the debtor's services, is around $400,000.00 (two and a half times salary). However, I do not place

ceived a $52,000.00 lump sum payment plus $60,000.00 in $1,000.00 increments as the units were built. Thus, the total compensation received was $112,000.00. This is more than the debtor's own expert testified the services were worth. Even if one were to assume that the debtor did more than a typical land planning firm, there is no unjust enrichment to Centurion.

The third, and perhaps most important, reason that the debtor's claim must fail is because of the unclean hands doctrine. The Minnesota Supreme Court described the doctrine and its purpose in *Johnson v. Freberg:*

> The equity rules, that he who seeks equity must do equity and that he who comes into equity must come with clean hands, are recognized and followed by all courts. The application of those rules to the facts in any particular case is not without difficulty. The limits of the rules are not well defined. These rules or maximums operate to deny relief to or from conduct which is fraudulent, illegal or unconscionable. The misconduct need not be of such a nature as to be actually fraudulent or constitute a basis for legal action. The plaintiff may be denied relief where his conduct has been unconscionable by reason of a bad motive, or where the result induced by his conduct will be unconscionable either in the benefit to himself or the injury to others.

178 Minn. 594, 597–98, 228 N.W. 159, 160 (1929). Cited with approval in *Hruska v. Chandler Associates, Inc.,* 372 N.W.2d 709, 715 (Minn.1985). Because a claim for unjust enrichment is an equitable remedy, *see Skjod v. Hofstede,* 402 N.W.2d 839, 840 (Minn.Ct.App.1987), the equitable defense of unclean hands is applicable to this case.

 I find that the debtor's conduct precludes its recovery for unjust enrichment. Through its officer, Ronald Bastyr, the debtor converted over $350,000.00 in funds that were suppose to be used to pay trade creditors of the Cherry Hill project. Now,

the debtor asked this court to invoke its equitable powers to offset Centurion's claim, the majority of which is due to the debtor's misconduct. Under the circumstances, whatever benefit the debtor may have conferred upon Centurion does not amount to an unjust enrichment.

### III.

To summarize, the debtor has proved that it is not liable for the warranty work on Cherry Hill Homes, and therefore, categories D, E, and F of Centurion's claim totalling $23,406.79 is disallowed. However, the debtor failed to prove it has a right of setoff against the remainder of Centurion's claim. Not only did the debtor fail to show that Centurion had been unjustly enriched, the debtor has no right to even assert a claim for unjust enrichment. There can be no recovery of quasi-contractual liability where an expressed contract exists covering the same subject matter. Moreover, the debtor's misconduct effectively bars its claim for equitable relief. The stipulated claim will be allowed less the stipulated setoff.

THEREFORE, IT IS ORDERED: Claim number 38 filed by Centurion Company is allowed as an unsecured claim in the amount of $213,052.22

---

much weight in Bastyr's testimony primarily because there is no evidence to indicate whether the debtor salaries are reasonable. Even if the debtor's estimate is assumed to be accurate, there is no unjust enrichment. Centurion paid the debtor $112,000.00 and other professionals assisting the debtor $175,000.00 for a total of $287,000.00. The difference between the amount actually paid and the debtor's estimate is not unconscionable.