# United States Bankruptcy Appellate Panel
## FOR THE EIGHTH CIRCUIT

———————

No. 00-6110NE

———————

| | | |
|---|---|---|
| In re: | * | |
| | * | |
| Richard Burdette White and | * | |
| Jayne Maree White, | * | |
| | * | |
| Debtors. | * | |
| | * | |
| Richard Burdette White and | * | Appeal from the United |
| Jayne Maree White, | * | States Bankruptcy Court |
| | * | for the District of Nebraska |
| Appellants, | * | |
| | * | |
| v. | * | |
| | * | |
| Coors Distributing Co., | * | |
| | * | |
| Appellee. | * | |
| | * | |

———

Submitted: February 21, 2001
Filed: April 2, 2001

———

Before KOGER, Chief Judge, WILLIAM A. HILL, and DREHER, Bankruptcy Judges.

———

DREHER, Bankruptcy Judge.

Richard Burdette White and Jayne Maree White ("Debtors") appeal from the bankruptcy court's[1] decision granting Coors Distributing Co. ("Coors") an allowed secured claim for $18,000. For the reasons stated below, we affirm.

FACTS and PROCEDURAL HISTORY

In May 1997, Debtors purchased a Dodge pickup truck from Ross Perry Motors d/b/a Crossroads Dodge ("Ross Perry"). The cash price for the truck was $27,015. Debtors opted, however, to purchase the truck on time under a "Retail Installment Contract and Security Agreement" ("contract") for $35,317.60. The rate of interest specified in the contract was 18% per annum. Debtors made a down payment and financed the remaining balance. Soon after the sale, Ross Perry assigned the contract to Coors.[2]

Between June 1997 and September 1999, Debtors made sporadic payments on the contract. This sporadic prepetition payment history prompted Coors to file a replevin action in Nebraska state court in December 1998, and Coors repossessed the truck. In response, on January 5, 1999, Debtors filed a Chapter 13 petition, which stayed the state court replevin action. Coors subsequently filed a proof of claim in the amount of $14,557.08. Coors sought unpaid principal due in the amount of $12,152.54 and $2,404.54 in prepetition interest (calculated at 16% per annum). Coors also claimed a right to postpetition interest and, in separate applications, which were considered as part of the claim, its attorneys' fees and costs incurred in collection activity, all pursuant to § 506(b) of the Bankruptcy Code.

---

[1]The Honorable John C. Minahan, Jr., United States Bankruptcy Judge for the District of Nebraska.

[2]Coors is a liquor distributor which does business as R.C. Distributing and is referred to as such in some of the relevant agreements and the parties' pleadings. Coors and Ross Perry have the same principals and owners and many of the same shareholders. Shortly after the sale in May 1997, Ross Perry originally sought to assign the contract to First National Bank which refused the assignment. Ross Perry then assigned the contract to Coors. Debtors claim that this arrangement in which Coors accepted contracts from Ross Perry took place on two prior occasions. In August 1996, Debtors purchased a Ford truck from Ross Perry. The agreement was later assigned to Coors. Debtors also, in October 1996, purchased a 1985 Chevrolet van. In the agreement, Ross Perry is crossed out as the seller and R.C. Distributing is hand-written in, indicating that perhaps this transaction was a direct sale, not an assignment. The assignments which took place in August 1996 and May 1997 are, thus, not assignments to independent third parties. Rather, they look more like intercompany transactions.

Debtors acknowledged that Coors was an oversecured creditor. They argued, however, that under the Nebraska Installment Sales Act, only sellers and licensed sales finance companies may charge 18% interest on installment sales contracts. Because Coors was not the seller nor a licensed sales finance company, Debtors maintained that Coors could not legally charge 18% interest and was thus barred from collecting any interest at all. Debtors sought to have Coors' claim reduced to the principal balance due on the debt at the date of filing, less interest they had already paid. Debtors also objected to Coors' claim for attorneys' fees. Debtors asserted that the contract did not provide for recovery of attorneys' fees; if it did, Nebraska law did not allow for recovery of both attorneys' fees and interest; and the fees and costs sought by Coors were neither adequately documented, nor reasonable. Finally, Debtors argued that, even if Coors could recover the interest it sought and attorneys' fees, Debtors were entitled to a setoff against Coors. Specifically, Debtors claimed they should be able to set off the value of a camcorder stored in the truck when it was repossessed; a ten dollar daily depreciation amount for each day Coors held the truck; a mileage reimbursement of nine cents/mile for the 1,400 miles Coors put on the truck; and a $150 reimbursement for an oil change and detailing charge.

Debtors' bankruptcy case was converted to Chapter 7 in September 1999, and a trustee was appointed. The trustee subsequently sold the truck for $18,000.

The bankruptcy court overruled Debtors' objection to Coors' claim. Relying on § 506(b) of the Bankruptcy Code, the bankruptcy court ruled that, because Coors was an oversecured creditor, after the costs of the sale were deducted from the sale price, Coors was entitled to an allowed secured claim for the amount of principal and interest due at the commencement of the case, postpetition interest at a rate of 18%, and its reasonable attorneys' fees, costs and expenses, up to the sale price.[3] The court specifically held that the contract was not usurious and that Coors was not required to be licensed as a sales finance company. The court also held that the contract provided that, upon default, Coors could recover from Debtors its attorneys' fees and collection costs and that the fees and costs requested were reasonable and adequately documented. Finally, the court held that Debtors lacked standing to set off because the claims Debtors were asserting belonged to the Chapter 7 trustee.

---

[3]In its decision, the bankruptcy court determined only the amount of Coors' allowed secured claim, as that was the sole issue presented by the parties. The bankruptcy court did not determine the entire claim amount, including secured and unsecured portions, to which Coors may be entitled.

3

Debtors challenge the bankruptcy court's ruling on the award of interest and attorneys' fees and costs. They also assert that the court erred in not allowing them to set off their claims for damages against the amounts owed.[4]

## STANDARD OF REVIEW

An appellate court reviews a bankruptcy court's conclusions of law *de novo* and its findings of fact for clear error. See Merchants Nat'l Bank of Winona v. Moen (In re Moen), 238 B.R. 785, 790 (B.A.P. 8th Cir. 1999); Bachman v. Laughlin (In re McKeeman), 236 B.R. 667, 670 (B.A.P. 8th Cir. 1999). This case primarily involves review of the bankruptcy court's interpretation and application of § 506(b) under a *de novo* standard. See United States v. Brummels, 15 F.3d 769, 771 (8th Cir. 1994) (stating that standard of review for the lower court's "application of facts to the legal interpretation" of a statute is *de novo*); Wegner v. Grunewaldt, 821 F.2d 1317, 1320 (8th Cir. 1987) (stating that reviewing court considers bankruptcy court's statutory constructions *de novo*). More specifically, however, the bankruptcy court's actual award of attorneys' fees and interest under § 506(b) is reviewed for an abuse of discretion. See Williams v. Official Unsecured Creditors' Comm. (In re Connolly), 238 B.R. 475, 478 (B.A.P. 9th Cir. 1999) ("A bankruptcy court's award of attorneys' fees pursuant to § 506 will not be disturbed unless the bankruptcy court abused its discretion or erroneously applied the law."). A bankruptcy court abuses its discretion when it relies upon erroneous legal conclusions or clearly erroneous factual findings. See Amtech Lighting Serv. Co. v. Payless Cashways (In re Payless Cashways, Inc.), 230 B.R. 120, 138 (B.A.P. 8th Cir. 1999), aff'd, 203 F.3d 1081 (8th Cir. 2000).

## DISCUSSION

A.    Standing

Though the bankruptcy court did not explicitly address it, Coors suggests that Debtors may not have standing to object to Coors' claim at all. Section 502(a) provides that a "claim or interest, proof of

---

[4]Coors also argues that the appellate court should not consider many of Debtors' arguments because they are being raised for the first time in this appeal. While some of the confusing nuances of Debtors' arguments are perhaps being raised for the first time on appeal, all of the arguments Debtors make in their appellate briefs appear in some form or another in papers submitted to the trial court or in oral arguments at the hearings.

which is filed under section 501 of this title, is deemed allowed, unless a party in interest ... objects." 11 U.S.C. § 502(a) (1994). The general rule is that a debtor "has no standing to object to claims or orders relating to them because the debtor does not have a pecuniary interest in the distribution of the assets of the estate." Kieffer v. Riske (In re Kieffer-Mickes, Inc.), 226 B.R. 204, 208 (B.A.P. 8th Cir. 1998) (citing Kapp v. Naturelle, Inc. (In re Kapp), 611 F.2d 703, 706-07 (8th Cir. 1979)). But the "debtor may be a party in interest with standing to object to a proof of claim" in certain cases. 3 Lawrence P. King, Collier on Bankruptcy ¶ 502.02[2][c] (15th rev. ed. 2000). In particular, in Chapter 13 cases, a debtor may have standing because "the success of the debtor's plan may depend upon the debtor being able to argue successfully that the debt asserted as a priority or secured claim ... is excessive or invalid." Id. However, in Chapter 7 cases, "the debtor usually has no pecuniary interest that would justify standing unless there could be a surplus after all claims are paid." Id. See also In re Kieffer-Mickes, 226 B.R. at 209 ("The exception is where it appears that, if the contested claims are disallowed, there will be a surplus." (internal citations omitted)).

In this case, Debtors originally filed a Chapter 13 case in which they most likely had standing to challenge the validity and amount of Coors' claim. Upon conversion to Chapter 7, Debtors maintained their standing to object to Coors' claim. Because their bankruptcy estate is solvent, they may be entitled to receive any surplus after all claims have been paid. Therefore, they have standing to object to Coors' claim. We underscore, however, that this issue of Debtors' standing to object to Coors' claim generally is wholly separate from the issue we take up later of Debtors' standing to bring a claim for setoff.

B.     Interest

There are two prongs to Debtors' argument regarding interest. First, Debtors contend that Coors is attempting to collect a rate of interest higher than that allowed by Nebraska state law. As a consequence, they argue, Coors is entitled to collect only the principal amount set forth in the contract or, at the very least, no more than 16% interest. Second, they urge that Coors may not claim postpetition interest because § 506(b) of the Bankruptcy Code does not permit an oversecured creditor to seek an award of interest that is usurious under state law.

1.    Nebraska Law

Section 502 of the Bankruptcy Code provides that the bankruptcy court shall allow a claim "except to the extent that–(1) such claim is unenforceable against the debtor . . . under . . . applicable law . . . ." 11 U.S.C. § 502(b)(1) (1994). Relying on this provision, Debtors suggest Coors may not enforce the 18% interest rate set forth in the contract under applicable law and may recover only its principal.

In Nebraska, subject to certain exceptions, any interest rate agreed upon by the parties to a contract is valid, up to 16% per annum on the unpaid balance. See Neb. Rev. Stat. Ann. § 45-101.03(1) (Michie 2000); see also Neb. Rev. Stat. Ann. § 45-101.04 (Michie 2000) (setting forth exceptions to general interest rate). If the contract sets out an interest rate greater than 16%, "the contract shall not on that account be void." Neb. Rev. Stat. Ann. § 45-105 (Michie 2000). Instead, the plaintiff may recover "only the principal, without interest, and the defendant shall receive costs." Neb. Rev. Stat. Ann. § 45-105. This 16% interest rate limitation and principal recovery rule does not apply to goods or services sold under an installment contract pursuant to the Nebraska Installment Sales Act. See Neb. Rev. Stat. Ann. § 45-101.04(13) (Michie 2000).

The Nebraska Installment Sales Act governs installment sales. See Neb. Rev. Stat. Ann. §§ 45-333 to 353 (Michie 2000). "[I]nstallment sale" is defined as:

> any transaction, whether or not involving the creation or retention of a security interest, in which a buyer acquires goods or services from a seller pursuant to an agreement which provides for a time-price differential and under which the buyer agrees to pay all or part of the time-sale price in one or more installments and within one hundred forty-five months, except that installment contracts for the purchase of mobile homes may exceed such one-hundred-forty-five-month limitation. Installment sale shall not include a consumer rental purchase agreement defined in and regulated by the Consumer Rental Purchase Agreement Act.

Neb. Rev. Stat. Ann. § 45-335(5) (Michie 2000). Installment sale is broadly-defined to encompass most types of installment sales under Nebraska law. See Engelmeyer v. S.A. Murphy & Lubkers, Inc., 142 N.W.2d 342, 354 (Neb. 1966) ("The classification [of installment sales under the Act] is very comprehensive and generally excludes only installment sales of real estate or installment sales where payments will extend more than 85 months [under the previous statutory time period]."). Under this definition, "time-price differential," in turn, "shall mean the amount, as limited in the Nebraska Installment

Sales Act, to be added to the basic time price." Neb. Rev. Stat. Ann. § 45-335(9) (Michie 2000). More specifically, the "time-price differential for any goods or services sold under an installment contract shall be stated as a fixed or variable annual percentage rate and shall be at a rate agreed to in writing, not to exceed eighteen percent per annum[.]" Neb. Rev. Stat. Ann. § 45-338 (Michie 2000).

Installment contract is likewise broadly-defined: "an agreement entered into in this state evidencing an installment sale except those otherwise provided for in separate acts." Neb. Rev. Stat. Ann. § 45-335(5) (Michie 2000). In addition, an installment contract must be in writing and signed by both the buyer and the seller and contain, *inter alia*: (1) the cash sale price; (2) the amount of the buyer's down payment; (3) the difference between the cash price and the buyer's down payment; (4) the time-price differential; (5) the number, amount, and due date or period of each installment; and (6) the time-sales price. See Neb. Rev. Stat. Ann. § 45-336 (Michie 2000).

In this case, the contract contained all of the requisites of, and the parties agree it was, an installment sales contract. It was written; signed by the buyers and the seller; listed the cash sale price, the amount of the buyers' down payment, the interest rate at 18% per annum, and the amount financed; and detailed the installment payment amounts and due dates. See Humber v. Gibreal Auto Sales, Inc., 298 N.W.2d 363, 364 (Neb. 1980) (affirming lower court's factual findings that automobile contract labeled "lease" was nevertheless an installment sales contract because it looked like an installment sales contract). As such, the contract was governed by the Nebraska Installment Sales Act. More specifically, the 18% per annum interest rate provided for in the contract was permissible. See Neb. Rev. Stat. Ann. § 45-338 (Michie 2000).

Debtors argue, however, that Coors is not entitled to collect interest of 18% because Coors was not the original seller and was not a licensed sales finance company. Debtors' argument is flawed for two reasons. First, Coors, as an assignee, not in the business of operating as a sales finance company, was not required to be licensed. Second, Nebraska law does not provide the relief Debtors claim, even if there was a violation of the Installment Sales Act.

As a threshold matter, Debtors agree that the original contract between Ross Perry and Debtors was a lawful installment sales contract on which Ross Perry was entitled to charge 18% interest. Coors is merely the assignee of a legal contract. In Bateman v. Liggett, 279 N.W.2d 137, 140 (Neb. 1979), the Nebraska Supreme Court found that an assignee was not required to have a license to collect the lawful

7

rate of interest: "the assignee acquires all the right, title, and interest of the licensee and may sue for, collect, and receive any lawful rate of interest provided for in the installment loan agreement although the assignee does not have a license to engage in the installment loan business." There, the lender who was licensed to do business under the Installment Loan Act assigned the loan to one of its creditors in satisfaction of a debt. See Bateman, 279 N.W.2d at 138. The court underscored that the "installment loan act contains no prohibition against the assignment of loans to a nonlicensee" and that the underlying transaction otherwise complied with the statutory requirements of the Installment Loan Act. See id. at 139-40. Therefore, the court saw no justifiable reason to limit the assignee's recovery merely because she lacked the requisite license. See id. at 140.

Applying Bateman to this case, when Ross Perry assigned the contract to Coors, Coors acquired the right to receive 18% interest under the Installment Sales Act and was not required to obtain a license to lawfully do so. Coupled with the specifics of the arrangement under which Coors acquired the installment contract in this instance,[5] this intercompany transfer, contrary to Debtors' arguments, falls within Bateman. Ross Perry did not assign the contract to a wholly separate entity. Instead, the contract was assigned to Coors, a related company which shares the same principals and owners as Ross Perry.

Even if we accept Debtors' argument regarding the inapplicability of Bateman, we still find Coors is entitled to recover interest at an 18% interest rate on another basis. Under the Installment Sales Act, a sales finance company is defined as "a person engaged in whole or in part, in the business of purchasing installment contracts from one or more sellers." Neb. Rev. Stat. Ann. § 45-335(11) (Michie 2000). Sales finance company "shall include, but not be limited to, a bank, trust company, investment company, savings and loan association, or installment loan licensee, if so engaged." Id. Applying this statutory definition, Coors was not "in the business of" purchasing installment contracts.

In a recent decision construing the term "dealer" under the Perishable Agricultural Commodities Act, the Eighth Circuit noted that "'engaged in the business' should not be understood to apply only to those engaged *primarily* in the business." Demma Fruit Co. v. Old Fashioned Enter., Inc. (In re Old Fashioned Enter., Inc.), 236 F.3d 422, 426-27 (8th Cir. 2001) (internal quotes and citations omitted). That definition suggests that, as a threshold matter, the company must be "in the business" before we ever reach the question of the extent of the company's involvement in that business.

---

[5]See *supra* note 2.

8

In this case, Coors is a wholesale beer distributor which received, at most, three installment contracts through intercompany assignments. In addition to the contract for the pickup truck, Coors was the assignee on an installment contract for a Ford truck which lists Ross Perry as seller and Debtors as purchasers, though the record is somewhat unclear on the particulars of this arrangement. The other installment contract Debtors point to involving the purchase of a Chevy van may not have been an assignment at all because Coors is shown as the seller.[6] Coors is not the type of company this statute was intended to cover. In other words, though the list is admittedly not exhaustive, Coors does not fit within the category of companies statutorily labeled as "sales finance companies," e.g., banks, investment companies, and savings and loan associations. See Neb. Rev. Stat. Ann. § 45-335(11) (Michie 2000). While the statutory language "engaged in the business of" is admittedly qualified by "in whole or in part," Coors was involved in a limited number of intercompany assignments and was not a "business" which regularly purchased installment sales contracts or routinely took advantage of the 18% interest rate loophole.

Finally, even if Coors qualified as a sales finance company and ran afoul of the licensing requirement, the Installment Sales Act does not, contrary to Debtors' argument, provide that failure to obtain a license results in forfeiture of the 18% interest.[7] Rather, the Installment Sales Act merely provides that any person who violates any provision of the Act or engages in the business of a sales finance company without a license shall be guilty of a class II misdemeanor. See Neb. Rev. Stat. Ann. § 45-345 (Michie 2000). Section 45-343 further provides that a sales finance company (or any seller) who contracts for or collects excess payments may have to forfeit some portion of its interest. See Neb. Rev. Stat. Ann. § 45-

---

[6]On the contract itself, Ross Perry has been crossed out as the seller and R.C. Distributing handwritten in as the seller. Recall that Coors does business as R.C. Distributing.

[7]Forfeiture of interest *in toto* is the penalty for charging interest at a rate above the 16% maximum legal rate on a contract governed by the state usury statute. See Neb. Rev. Stat. Ann. § 45-101.03 (capping maximum legal rate of interest at 16%); see also Neb. Rev. Stat. Ann. § 45-105 (setting forth penalty for charging in excess of 16%); Thomas Lakes Owners Ass'n v. Riley, 612 N.W.2d 529, 538 (Neb. Ct. App. 2000) ("The penalty for charging a higher interest rate is loss of the interest." (citing Neb. Rev. Stat. § 45-105 (Reissue 1998)). We reject Debtors' alternative argument that the contract violates § 45-101.03 of the Nebraska Statutes which provides that the maximum general interest rate on sales of goods and other transactions is 16% per annum. See Neb. Rev. Stat. Ann. § 45-101.03. As previously noted, the 16% limitation on the interest rate does not apply to transactions governed by the Installment Sales Act. See Neb. Rev. Stat. Ann. § 45-101.04(13). The contract in this case is clearly an installment sales contract governed by the Installment Sales Act.

9

343 (Michie 2000). In other words, the state statutory provisions nowhere provide for the type of relief Debtors asked the bankruptcy court to grant.

Rejecting Debtors' arguments, we find that Coors, an assignee not in the business of purchasing installment contracts, is entitled to collect 18% interest on the contract as a matter of Nebraska law.[8]

2.      Section 506(b)

The foregoing resolves the issue of the legality of the interest rate, as well as Coors' entitlement to interest at the rate of 18% accrued prepetition. It does not, however, answer the question of whether Coors, as an oversecured creditor, is entitled to include postpetition interest as part of its allowed secured claim.

Section 506(b) of the Bankruptcy Code allows an oversecured creditor to recover attorneys' fees, postpetition interest, and other costs in certain circumstances:

> To the extent that an allowed secured claim is secured by property the value of which, after any recovery under subsection (c) of this section, is greater than the amount of such claim, there shall be allowed to the holder of such claim, interest on such claim, and any reasonable fees, costs, or charges provided for under the agreement under which such claim arose.

11 U.S.C. § 506(b) (1994). See also 11 U.S.C. § 506(c) (1994) ("The trustee may recover from property securing an allowed secured claim the reasonable, necessary costs and expenses of preserving, or disposing of, such property to the extent of any benefit to the holder of such claim."). Section 506(b) "entitles the holder of an oversecured claim to postpetition interest and, in addition, gives one having a secured claim created pursuant to an agreement the right to reasonable fees, costs, and charges provided for in that agreement." United States v. Ron Pair Enter., Inc., 489 U.S. 235, 241 (1989). Recovery of postpetition interest under §506(b) is not dependent on any underlying agreement. See id. Rather, an

---

[8]In its proof of claim, Coors sought 16% interest. The bankruptcy court, however, awarded interest at 18%. Having determined that 18% is the appropriate rate, we find that the bankruptcy court could, and did, properly award Coors interest at that rate.

oversecured creditor's right to postpetition interest under § 506(b) is "unqualified." Id. As an oversecured creditor, Coors is therefore entitled to postpetition interest.

In its decision in Ron Pair, the Supreme Court did not set the rate at which an oversecured creditor is entitled to recover such interest; however, most courts have concluded that "postpetition interest should be computed at the rate provided in the agreement, or other applicable law, under which the claim arose–the so-called contract rate of interest." 3 Lawrence P. King, Collier on Bankruptcy ¶ 506.04[2][b][i] (15th ed. revised 2000). See also KCC-Leawood Corporate Manor I v. Travelers Ins. Co., 117 B.R. 969, 974 (W.D. Mo. 1989) (stating that § 506(b) "permit[s] a creditor to have the benefit of its bargain, that is, the contract interest rate on an oversecured debt–but only to the value of the collateral"). In this case, the bankruptcy court properly awarded Coors postpetition interest on its claim at the 18% rate specified in the contract.[9]

## C.     Attorneys' Fees and Costs

The bankruptcy court also properly awarded Coors its attorneys' fees incurred in attempting to collect on the debt. Under § 506(b), "recovery of ... fees, costs, and charges is allowed only if they are reasonable and provided for in the agreement under which the claim arose." United States v. Ron Pair Enter., Inc., 489 U.S. 235, 241 (1989). To recover attorneys' fees, a creditor must establish that: (1) it is oversecured in excess of the fees requested; (2) the fees are reasonable; and (3) the agreement giving rise to the claim provides for attorneys' fees. First W. Bank & Trust v. Drewes (In re Schriock Constr., Inc.), 104 F.3d 200, 201 (8th Cir. 1997).

---

[9]Debtors somewhat inartfully point out that some case law and commentary suggests that applicable nonbankruptcy law governs the rate at which postpetition interest is awarded under § 506(b). See, e.g., 3 Lawrence P. King, Collier on Bankruptcy ¶ 506.04[2][b] (15th rev. ed. 2000) ("In general, the better view is that the relevant rate is to be established as set forth in the contract (if any), or otherwise applicable nonbankruptcy law."). Some courts have refused to allow recovery of postpetition interest at a rate that is unreasonable or usurious under state law. See, e.g., United States Trust Co. v. LTV Steel Co., Inc. (In re Chateaugay Corp.), 150 B.R. 529, 533 (Bankr. S.D.N.Y. 1993), aff'd, 170 B.R. 551 (S.D.N.Y. 1994) (refusing to award compound interest as specified in contract because applicable state law prohibited such an award). However, this is not an issue here, since we have previously held that Coors is entitled to an 18% interest rate under Nebraska law.

11

In terms of the first element, the parties agree that Coors is an oversecured creditor–the value of its collateral is greater than the amount of its claim.[10] This leaves only the questions of whether the fees are provided for in the contract and are reasonable.

As for the second element, the bankruptcy court did not abuse its discretion in awarding Coors slightly more than $7,000 in such attorneys' fees and costs. To determine the reasonableness of the attorneys' fees under the second element, courts consider: (1) "whether the *actions* taken by the creditor were reasonable and prudent in the circumstances," i.e., whether the fees were "incurred in protecting the creditor's rights in its collateral"; and (2) if so, "whether the *itemized fees* are reasonable." In re Cushard, 235 B.R. 902, 906-07 (Bankr. W.D. Mo. 1999) (emphasis in original). See also In re Schriock Constr., Inc., 210 B.R. 348, 349 (Bankr. D.N.D. 1997) (decision on remand) (considering whether hourly rates were reasonable and whether hours billed were reasonable). The creditor bears the burden of proof on each of these elements. See Cushard, 235 B.R. at 906. In this case, the bankruptcy court considered these factors, properly applied the lodestar formula, and found that the attorney's rates and hours were reasonable, given his expertise and the complexity of this case, and that the attorney had adequately documented his time. Moreover, the record indicates that the court properly allocated the burden of proof, requiring Coors' attorney to defend his fees.[11] We find no error here.

To satisfy the third element, Coors points to the following paragraph in the contract as entitling it to recover its attorneys' fees:

---

[10]Even though the blue-book or market value of the pickup truck was estimated to be around $21,000, the parties do not dispute the valuation of the collateral at $18,000, which represents the amount the trustee recovered for Debtors' estate in the sale to Ross Perry. See 3 Lawrence P. King, Collier on Bankruptcy ¶ 506.03[6][b] (15th rev. ed. 2000) ("[I]t is important to point out that, regardless of the purpose of the valuation, if an actual sale (or equivalent disposition) is to occur the value of the collateral should be based on the consideration to be received by the estate in connection with the sale, provided that the terms of the sale are fair and were arrived at on an arm's length basis" (internal citations omitted)); see also Associates Commercial Corp. v. Rash, 520 U.S. 953 (1997) (discussing valuation of collateral). Though the value of the collateral for purposes of § 506(b) may arguably have been different, we use the $18,000 amount because the parties have not challenged that amount on appeal.

[11]Contrary to Debtors' argument, there is no requirement under § 506(b), as interpreted in Schriock Construction, that the creditor must show it has a fee agreement with the attorney and that it has actually paid attorneys' fees pursuant to that agreement.

12

REMEDIES–If you are in default on this contract, we have all of the remedies provided by law and this contract. We may:

(d) immediately repossess property by legal process or self-help, without the use of force. We may then sell the property and apply the proceeds as provided by law to our expenses and then toward your secured obligations. Expenses include our cost of repossession, cost of holding the property, attorneys' fees (where permitted), repairs (if necessary) and costs of sale; and

(e) be entitled to a deficiency judgment against you if the proceeds of the sale do not pay all of the expenses and secured obligations (except when prohibited by law).

This provision in the contract is somewhat ambiguous and arguably susceptible to at least two interpretations. One possible interpretation is that this provision allowed the seller or its successors and assigns to recover only those costs incurred in actual repossession of the vehicle. An alternative, and more natural, interpretation is that the seller may recover all costs, including attorneys' fees, incurred in enforcing the contract against the purchaser upon default. In this case, the bankruptcy court construed the contract provision under the latter interpretation. A lower court's interpretation of an ambiguous contract is a finding of fact which an appellate court will leave undisturbed unless it is clearly erroneous. See, e.g., Kropp v. Grand Island Pub. Sch. Dist., 517 N.W.2d 113, 116 (Neb. 1994) ("A contract is ambiguous when a word, phrase, or provision in the contract has, or is susceptible of, at least two reasonable but conflicting interpretations or meanings. The meaning of an unambiguous contract is a question of law. In contrast, the meaning of an ambiguous contract is generally a question of fact." (internal citations omitted)); Plambeck v. Union Pacific R.R. Co., 509 N.W.2d 17, 20 (Neb. 1993) ("When a contract is ambiguous, the meaning of the contract is a question of fact[.]"). See generally Mohamed v. Unum Life Ins. Co., 129 F.3d 478, 480 (8th Cir. 1997) ("If the contract is ambiguous, the meaning of the contract becomes a question of fact; and we reject the district court's findings of fact only if they are clearly erroneous." (internal quotes and citations omitted)). The bankruptcy court's interpretation of the contract in this case was not clearly erroneous.

Debtors suggest that contract clauses regarding the award of attorneys' fees must be strictly construed, though they cite no authority for such a proposition. We acknowledge that under Nebraska law, statutes allowing attorneys' fees must be strictly construed, see Northwestern Nat'l Bank v. American Beef Packers (In re American Beef Packers, Inc.), 548 F.2d 246, 248 (8th Cir. 1977) (citing Warren v. Warren, 149 N.W.2d 44 (Neb. 1967)), but we have found no such equivalent requirement for provisions allowing recovery of attorneys' fees in installment sales contracts specifically or contracts more generally.

13

That said, even if, as Debtors urge, we construed the provision at issue in this case narrowly, we find it clearly reaches costs of collection. Moreover, as discussed more fully below, we underscore that Nebraska law does not govern the award of attorneys' fees. See First W. Bank & Trust v. Drewes (In re Schriock Constr. Co.), 104 F.3d 200, 202 (8th Cir. 1997) (making clear that the right to attorneys' fees under § 506(b) is a matter of federal, not state law).

Debtors next argue that the agreement must explicitly provide for recovery of attorneys' fees in a bankruptcy or litigation proceeding. There is no such requirement under the statute or the case law. Moreover, given the policy behind § 506(b) that creditors are entitled to recover their attorneys' fees for protecting their rights and interests in the debtor's collateral, the contract in this case is sufficient. Therefore, applying § 506(b), the bankruptcy court did not err in finding that Coors was entitled to recover its attorneys' fees and costs under the remedies provision of the contract.

Debtors' main argument, however, is that under Nebraska law, a contract which provides both for interest at the maximum rate allowed by law and attorneys' fees is usurious and unenforceable. Specifically, citing several pre-1900 Nebraska Supreme Court cases, Debtors argue that a contract with an 18% interest rate plus a provision allowing the seller to collect attorneys' fees upon the buyer's default is usurious. See, e.g., Interstate Sav. & Loan Ass'n v. Strine, 78 N.W. 377 (Neb. 1899); Montgomery v. Albion Nat'l Bank, 70 N.W. 239 (Neb. 1897); Rosa v. Doggett, 8 Neb. 48, 1878 WL 3934 (1878). Debtors' reliance on these cases is misplaced for a couple of reasons. First, none of these cases supports Debtors' position. Admittedly, the courts in these cases found that the interest rate in the contract was usurious and that the movant was not entitled to its attorneys' fees or costs. But the courts draw no correlation between the interest rate specified in the contract and the award or non-award of attorneys' fees.

Second, and more importantly, Debtors' argument ignores controlling Eighth Circuit authority. In First Western Bank & Trust v. Drewes (In re Schriock Construction, Inc.), 104 F.3d 200 (8th Cir. 1997), the court was faced with an identical argument which it rejected. There, the Eighth Circuit held that "the plain language of section 506(b) expressly provides for the award of attorney's fees in bankruptcy proceedings, without reference to contrary state law." Id. at 202. In other words, § 506(b) does not state that an oversecured creditor's right to recover attorneys' fees hinges on state law; rather, it "'establishes a federal right to reasonable attorney's fees for the oversecured creditor irrespective of state law.'" Id. at 203 (quoting In re McGaw Prop. Mgmt., 133 B.R. 227, 230 (Bankr. C.D. Cal. 1991)). See also In re Record Enter., 189 B.R. 769, 771 (D. Neb. 1986) (finding that "the weight of authority supports the enforceability

14

of attorney's fees arrangements in the contract notwithstanding contrary state law" and awarding attorneys' fees to oversecured creditor under § 506(b) even though attorney fee arrangement in guaranty was unenforceable under Nebraska law); Kord Enter. II v. California Commerce Bank (In re Kord Enter. II), 139 F.3d 684, 688-89 (9th Cir. 1998) ("An analysis of § 506(b) and relevant case law . . . confirms that § 506(b) preempts state law. First, § 506(b) does not reference state law. The section does not require that attorneys' fees be awarded only when state law would permit such an award. . . . Second, the legislative history of § 506(b) suggests that Congress considered and rejected the idea that fees should be subject to state law.").

In arguing that state law, rather than federal law, governs here, Debtors try to factually distinguish the Schriock Construction decision. We reject Debtors' argument, finding that the Eighth Circuit's decision in Schriock Construction is controlling in this case. See Schriock Construction, 104 F.3d at 203 (stating explicitly that § 506(b) "establishes a federal right to reasonable attorney's fees for the oversecured creditor irrespective of state law" (internal quotes and citations omitted)). Under Schriock's reading of § 506(b), the validity of the contract rate of interest plus attorneys' fees under state law is of no consequence. Therefore, we affirm the bankruptcy court's award of Coors' reasonable attorneys' fees and costs.

D.     Setoff

Debtors next maintain that the bankruptcy court erred in not allowing them to set off their claims for damages against the amounts owed to Coors. In general, § 553 of the Bankruptcy Code "preserves a creditor's right to set off mutual obligations between it and the debtor." United States v. Gerth, 991 F.2d 1428, 1430 (8th Cir. 1993). That provision does not, however, address a debtor's right of setoff. See In re R. Bastyr & Assoc., Inc., 81 B.R. 978, 981 n.10 (Bankr. D. Minn. 1988). A debtor's right of setoff is governed by other provisions of the Bankruptcy Code and state law. See id. ("A debtor's right of setoff is established under state law and § 502 of the Bankruptcy Code."). In essence, a "debtor's right to setoff is property of the bankruptcy estate." Kaler v. Craig (In re Craig), 144 F.3d 593, 596 (8th Cir. 1998) (citing Collier on Bankruptcy ¶ 553.03[7][b] (15th ed. 1998)). Therefore, in a Chapter 7 case, only the trustee of the bankruptcy estate may properly assert the debtor's right to setoff. Cf. Constellation Dev. Corp. v. Dowden (In re B.J. McAdams, Inc.), 66 F.3d 931, 935 (8th Cir. 1995) ("The trustee steps into the shoes of the debtor for purposes of asserting or maintaining the debtor's causes of action, which become property of the estate." (quoting Regan v. Vinick & Young (In re Rare Coin Galleries of Am., Inc.), 862 F.2d 896, 901 (1st Cir. 1988)). See also Mixon v. Anderson (In re Ozark Rest. Equip. Co.,

15

Inc.), 816 F.2d 1222, 1225 (8th Cir. 1987) ("[I]t is clear that causes of action belonging to the debtor at the commencement of the case are included within the definition of property of the estate." (emphasis omitted)).

As a threshold matter, the bankruptcy court correctly determined that the setoff claims at issue were property of the estate. See Kaler v. Craig (In re Craig), 144 F.3d 593, 596 (8th Cir. 1998). These claims were initially property of Debtors' Chapter 13 bankruptcy estate and, upon conversion, remained property of the Chapter 7 estate under § 348(f)(1)(A).[12]

Based on the case law, the bankruptcy court also correctly determined that Debtors did not have standing to assert the claims of setoff and that such claims could only properly be brought by the trustee.[13] Having affirmed the bankruptcy court's decision regarding Debtors' lack of standing, we find the bankruptcy court correctly determined it did not have to reach the merits of Debtors' setoff claims.

CONCLUSION

The bankruptcy court correctly interpreted and applied Nebraska state law and § 506(b) and granted Coors an allowed secured claim which included postpetition interest at the contract rate as well

---

[12]Alternatively, the bankruptcy court points out that these claims may have remained property of Debtors' bankruptcy estate under § 348(f)(2) because Debtors' concealment of assets prompted conversion. See 11 U.S.C. § 348(f)(2) (1994).

[13]Debtors argue that the trustee has no incentive to pursue these claims; therefore, it makes little sense in this case to allow only the trustee to hold such claims. We reject Debtors' argument. If, as Debtors suggest, the trustee chooses not to pursue such claims, Debtors are not without recourse and may force the trustee to abandon the rights of setoff as property of the estate under § 554. See 11 U.S.C. 554(b) (1994) ("On request of a party in interest and after notice and a hearing, the court may order the trustee to abandon any property of the estate that is burdensome to the estate or that is of inconsequential value and benefit to the estate."); see also Kemp v. Tyson Seafood Group, Inc., 19 F. Supp.2d 961, 965 (D. Minn. 1998) ("'The debtor may regain standing to pursue a cause of action if the cause of action is abandoned by the trustee.'" (quoting Harris v. St. Louis Univ., 114 B.R. 647, 649 (E.D. Mo. 1990)); Hunt v. Up North Plastics, Inc., 177 F.R.D. 449, 451 (D. Minn. 1997) (discussing standing issues).

as reasonable attorneys' fees and costs capped by the sale price of the collateral, minus costs of sale.[14] It further properly determined that Debtors lacked standing to assert their setoff claims.

ACCORDINGLY, we affirm.

A true copy.

Attest:

CLERK, U.S. BANKRUPTCY APPELLATE PANEL
FOR THE EIGHTH CIRCUIT

---

[14]As suggested in note 3 *supra*, the bankruptcy court determined only the amount of Coors' allowed secured claim, not the amount, if any, of Coors' allowed unsecured claim. Thus, the issue of the amount to which Coors may be entitled as an unsecured claim over and above the amount of the collateral is not before us in this appeal.