Joseph F. Bataillon, Senior United States District Judge
This matter is before the Court on defendant's (hereinafter referred to "Creditor" or Auro) motion for summary judgment, Filing No. 17, and plaintiff's motion for partial summary judgment, Filing No. 20. Plaintiff (hereinafter referred to as "Debtor") filed a Chapter 11 bankruptcy petition on February 15, 2017, and on December 4, 2017, filed this adversary proceeding alleging that "(1) that the purchase agreement between Great Elm and Auro Vaccines did not include the Debtor's intellectual property; (2) Auro's post-purchase amendment to the Nebraska UCC-1 financing statement was a preferential transfer of the Debtor's property and is avoidable under 11 U.S.C. §§ 547(b) and 550 ; (3) Auro's proof of claim in the Debtor's bankruptcy case for the amount due on the promissory note should be barred because Full Circle did not obtain a deficiency judgment against the Debtor; and (4) Auro's proof of claim is unenforceable because Auro lacks standing and because the claim contains interest and other expenses *883 not allowed under 11 U.S.C. § 506(b)." Filing No. 1, at 1-2, complaint Amended Complaint, Filing No. 12, Bankruptcy Case. The parties agreed that this case contains both core and non-core matters that would exist outside of the bankruptcy context. As a result, the bankruptcy judge recommended that this Court withdraw the reference and that this core case proceed in the district court. Filing No. 1, at 3-4. This Court granted the reference and adopted the bankruptcy judge's recommendation. Filing No. 8.
STANDARD OF REVIEW
Summary judgment is appropriate when, viewing the facts and inferences in the light most favorable to the nonmoving party, "showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." Fed. R. Civ. P. 56(c)(1)(B). The plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial. Celotex Corp. v. Catrett , 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). "The movant 'bears the initial responsibility of informing the district court of the basis for its motion, and must identify 'those portions of [the record] ... which it believes demonstrate the absence of a genuine issue of material fact.' " Torgerson v. City of Rochester , 643 F.3d 1031, 1042 (8th Cir. 2011) (en banc) (quoting Celotex , 477 U.S. at 323, 106 S.Ct. 2548 ). If the movant does so, "the nonmovant must respond by submitting evidentiary materials that set out 'specific facts showing that there is a genuine issue for trial.' " Id. (quoting Celotex , 477 U.S. at 324, 106 S.Ct. 2548 ). "The inquiry performed is the threshold inquiry of determining whether there is the need for a trial-whether, in other words, there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." Anderson v. Liberty Lobby, Inc. , 477 U.S. 242, 250, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). If "reasonable minds could differ as to the import of the evidence," summary judgment should not be granted. Id. at 251, 106 S.Ct. 2505.
The evidence must be viewed in the light most favorable to the nonmoving party, giving the nonmoving party the benefit of all reasonable inferences. Kenney v. Swift Transp., Inc. , 347 F.3d 1041, 1044 (8th Cir. 2003). "In ruling on a motion for summary judgment, a court must not weigh evidence or make credibility determinations." Id. "Where the unresolved issues are primarily legal rather than factual, summary judgment is particularly appropriate." Koehn v. Indian Hills Cmty. Coll. , 371 F.3d 394, 396 (8th Cir. 2004).
FACTS
The facts are substantially undisputed, and only the characterization and interpretation are at issue. Defendant provides the Court with the following "undisputed facts":
1. The Debtor filed this adversary proceeding in the U.S. Bankruptcy Court for the District of Nebraska (the "Bankruptcy Court") on August 15, 2017. (Doc. 1, Exhibit 2, p. 1). The Debtor filed the Amended Complaint in this matter on December 4, 2017. (Doc. 1, Exhibit 2, p. 3).
*884 2. This court has jurisdiction pursuant to 28 U.S.C. § 1334.
3. Venue is proper in this district pursuant to 28 U.S.C. § 1409.
4. The reference pursuant to 28 U.S.C. § 157 was withdrawn in this case on May 29, 2018. (Doc. 8).
5. The Plaintiff is a Nebraska corporation that was formerly engaged in research and development of a meningitis vaccine. (Eversden Declaration, Exhibit 1, Amended Complaint ("Amended Complaint"), ¶ 1; Eversden Declaration, Exhibit 5, Aramalla Declaration dated February 24, 2017 ("Aramalla Declaration"), ¶ 2-3).
6. The Defendant is a Delaware limited liability company that has a secured claim in the Plaintiff's bankruptcy case, with a security interest in substantially all of the Plaintiff's assets. (Amended Complaint, ¶ 2; Iyer Declaration, ¶ 4).
7. In the Amended Complaint, the Debtor admits that it entered into a Loan, Guaranty and Security Agreement on June 30, 2014 with Full Circle Capital Corporation ("Full Circle"), pursuant to which the Debtor borrowed $ 3.5 Million from Full Circle (the "Loan"). (Amended Complaint, p. 3, ¶ 14; Exhibit A--Loan Agreement (the "Loan Agreement") ). The Debtor further admits that a copy of the Loan Agreement is attached to the Amended Complaint. (Amended Complaint, p. 3, ¶ 14).
8. In the Loan Agreement, the Debtor expressly grants Full Circle a security interest in patents, specifically Patent Nos. 7,491,517 and 8,129,147. (Loan Agreement, p. 18, Sec. 5(a)(viii), and p. 48, Schedule 19A).
9. In addition, the Debtor grants Full Circle a security interest in "General Intangibles." (Loan Agreement, p. 18, Sec. 5(a)(i) ).
10. The phrase "General Intangibles" is specifically defined in the Loan Agreement to include "patents and patent applications." (Loan Agreement, p. 6, Sec. 1).[1]
11. The Debtor admits it signed a promissory note in connection with the Loan Agreement and that a copy of the Note is attached to the Amended Complaint as Exhibit B. (Amended Complaint, p. 3, ¶ 18; Exhibit B-Term Loan Note (the "Note") ). A true and correct copy of that same Note, as endorsed, appears as Exhibit N to the Amended Complaint. (Iyer Declaration, ¶ 4-6).
12. The Debtor admits that, in connection with the Loan Agreement, it also signed a Deed of Trust, Assignment of Leases and Rents, Security Agreement, and Fixture Filing dated June 30, 2014. (Amended Complaint, p. 4, ¶ 22). The Debtor admits that a copy of that agreement is attached to its Amended Complaint as Exhibit C. (Amended Complaint, p. 4, ¶ 22, Exhibit C-Security Agreement (the "Security Agreement") ).
13. The Security Agreement grants Full Circle a blanket security interest in the Debtor's assets, including general intangibles and, specifically, "patents *885 and patent applications." (Security Agreement, p. 4-6, Sec. 1.1(g), (p) ).
14. Full Circle filed a UCC-1 financing statement on or about July 7, 2014 (the "Original Financing Statement") to perfect its security interest in the collateral pledged by the Debtor, including "general intangibles" and "patents and patent applications." (Amended Complaint, p. 4, ¶ 21; Eversden Declaration, Exhibit 11, Certified UCC Search Results and UCC Financing Statements ("UCC Filings"), p. 4-5, Sec. (g), (p) ).
15. The Original Financing Statement has not been terminated and remains effective today. (UCC Filings).
16. Both the Loan Agreement and the Security Agreement provide that the Debtor must pay fees and expenses, including attorney's fees, incurred in the collection of the loan and[2] enforcement of Full Circle's rights. (Loan Agreement, p. 30, ¶ 13(b)(viii); Security Agreement, p. 16-17, ¶ 7.1(h), and p. 18, ¶ 7.3).
17. The Debtor is also required under the Loan Agreement and Security Agreement to pay expenses the lender incurs in maintaining its collateral position. (Loan Agreement, p. 26-27, ¶ 10(b), p. 29, ¶ 13(b)(iv); Security Agreement, p. 17, ¶ 7.3).
18. In addition, the Loan Agreement requires the Debtor to pay interest and default interest, which are variable based on LIBOR. (Loan Agreement, pp. 13-14, ¶ 3(a), (c) ).
19. The Loan Agreement and Note require monthly payments of accrued interest. (Loan Agreement, p. 13, ¶ 3(a); Note, p. 2).
20. The Debtor defaulted on its obligations under the Loan by failing to pay amounts owed (such as interest) when due, as the Debtor itself has admitted on several occasions, including in the Forbearance Agreement it signed on September 14, 2016 (Eversden Declaration, Exhibit 1-Forbearance Agreement (the "Forbearance Agreement"), p. 2), the deposition testimony given by its president Kevin Aramalla, (Eversden Declaration, Exhibit 6, Deposition of Kevin Aramalla dated April 12, 2017 ("Aramalla Deposition"), 102:17-105:12), the declaration of Kevin Aramalla filed in the Debtor's bankruptcy case, (Eversden Declaration, Exhibit 5, Declaration of Kevin Aramalla ("Aramalla Declaration"), p. 2-3, ¶¶ 9, 14); and the oppositions the Debtor filed in response to Auro's Motion to Dismiss and Motion for Relief from the Stay, (i.e., the Opposition of JN Medical Corporation to Auro Vaccines, LLC's Motion for Relief from the Automatic Stay, or in the Alternative, for Adequate Protection ("Opposition to MFR"), p. 3, ¶ 12, and the Opposition of JN Medical Corporation to Auro Vaccines, LLC's Motion to Dismiss the Chapter 11 Case ("Opposition to MTD"), p. 3, ¶ 12) ).
21. Full Circle gave notice to the Debtor on May 25, 2016 that the Debtor was in default in making the required payments and stated an amount of interest and fees that would need to be paid in order to cure the payment default. (Amended Complaint, p. 4, ¶ 25; Exhibit D ("Initial Default Notice"), pp. 2-5).
22. Full Circle filed a Notice of Default with the Douglas County Register of *886 Deeds on June 2, 2016, based on the Debtor's failure to pay amounts when due. (Amended Complaint, p. 5, ¶ 27; Exhibit E ("Filed Notice of Default"), p. 4-5).
23. On or about August 16, 2016 Full Circle conducted a foreclosure sale of the real property that was covered under the Security Agreement (the "Real Property"). (Amended Complaint, p. 5, ¶ 29).
24. Full Circle was the winning bidder at the foreclosure sale. (Amended Complaint, p. 5, ¶ 30).
25. A trustee's deed ("Trustee's Deed") was executed and recorded granting Full Circle title to the Real Property. (Eversden Declaration, Exhibit 12, Trustee's Deed). The Trustee's Deed recites that a "[b]reach and default occurred" under the Security Agreement. (Trustee's Deed, p. 1).
26. Full Circle and the Debtor entered the Forbearance Agreement on September 14, 2016. (Eversden Declaration, Exhibit 2, Forbearance Agreement (the "Forbearance Agreement") ). In the Forbearance Agreement, the Debtor makes the following acknowledgment:
[Debtor] acknowledges that it is in default of its obligations owed to the Lender pursuant to the Loan Documents (as defined in the Loan Agreement) as a result of, but not necessarily limited to, failing to pay the Note in accordance with its terms.
(Forbearance Agreement, p. 2).
27. The Debtor breached the Forbearance Agreement shortly after executing it. (Eversden Declaration, Exhibit 3 ("Notice of Breach"); Aramalla Deposition, p. 102:17-106:21).
28. Full Circle provided the Debtor the Notice of Breach on or about September 29, 2016. (Notice of Breach).
29. Full Circle was acquired by Great Elm Capital Corp. ("Great Elm") in late 2016. (Amended Complaint, p. 5, ¶ 32), and Great Elm thus succeeded to Full Circle's interest in the Debtor's loan and security interest. (Amended Complaint, Exhibit H ("Purchase Agreement"), p. 1).
30. On January 16, 2017, the Debtor's lawyer, John Moss, sent an email message to representatives of Great Elm, recognizing on the Debtor's behalf the existence of the debt owed to Great Elm and seeking time to put together a proposal to pay off the debt. A true and correct copy of the message appears in Exhibit 4 to the Eversden Declaration. (Eversden Declaration, Exhibit 4, Email Messages and Letter from John Moss ("Moss Messages") ), p. 2-3.
31. On January 19, 2017, Mr. Moss sent another message to Great Elm's representatives, attaching a letter in which he, on behalf of the Debtor, again acknowledges the existence of the debt, and this time makes a proposal for paying it. A true and correct copy of this message also appears in Exhibit 4 to the Eversden Declaration. (Moss Messages, pp. 1, 4-6).
32. Great Elm filed a UCC-3 financing statement on January 20, 2017, indicating that it had obtained an assignment of Full Circle's security interest in the Debtor's assets. (Amended Complaint, p. 6, ¶ 34; Exhibit G ("Great Elm UCC-3"), p. 2).
33. Auro entered into a purchase agreement with Great Elm dated February 3, 2017 along with an assignment and assumption agreement of the same date, whereby Auro purchased and took an assignment of the Loan from Great Elm. (Purchase Agreement; Amended *887 Complaint, Exhibit I, Assignment and Assumption Agreement ("Assignment") ).
34. Pursuant to the Purchase Agreement, Great Elm, as successor by merger to Full Circle, granted a special warranty deed for the Real Property to Auro. (Purchase Agreement, p. 1, § 1.01(a), p. 2, § 2.02(a); Eversden Declaration, Exhibit 13 ("Special Warranty Deed") ).
35. The Purchase Agreement expressly states that the assets transferred from Great Elm to Auro include "all security interests" and "all ... written instruments or documents evidencing, securing, perfecting, or otherwise pertaining to the Loan." (Purchase Agreement, p. 2-3, Section 1.01(b) ). That transfer therefore necessarily included the Loan Agreement and the Security Agreement, both of which grant a blanket security interest in the Debtor's personal property, including general intangibles and, in particular, patents and patentable inventions, as well as all proceeds from such personal property. (Loan Agreement, p. 18, Sec. 5; Security Agreement, p. 4-5, Sect. 1.1(g) ).
36. On February 15, 2017, Auro filed two UCC-3 financing statement amendments ("Auro UCC Amendments"): one to reflect the assignment from Great Elm to Auro, and the other to describe more specifically the intellectual-property collateral that had been generally described in the Original Financing Statement. (Amended Complaint, Exhibit J ("First Auro UCC Amendment"), p. 2; Exhibit K ("Second Auro UCC Amendment"), pp. 2-3; Original Financing Statement, p. 4-5, Sec. (g), (p) ).
37. Auro is in possession of the original Note, which has been properly endorsed to Auro. (Iyer Declaration, ¶ 5-6; Note, p. 4).
38. Auro filed the Claim on June 1, 2017. (Iyer Declaration, ¶ 7, Exhibit 1).
39. The Claim sets forth an accurate record of the fees, costs and expenses incurred by Auro and its predecessors through the date of the Claim (including interest calculated through June 8, 2017), except that Auro has adjusted its post-petition rent claim for the period from the petition date through June 8, 2017 down from $ 78,233.55 to $ 68,938.36 after discovering that a portion of the premises does not have utilities and should be valued as dry-storage space. (Iyer Declaration, ¶ 7).
40. The Debtor's assets have occupied the Real Property with Auro's consent since before the petition date. (Iyer Declaration, ¶ 11; Eversden Declaration, Exhibit 8, Stipulation between Auro and Debtor dated July 28, 2017 ("Stipulation"), p. 2, ¶ 3; Eversden Declaration, Exhibit 9, Order Approving Stipulation).
41. The Plaintiff has acknowledged defaulting on the Loan in its Opposition of JN Medical Corporation to Auro Vaccines, LLC's Motion for Relief from the Automatic Stay, or in the Alternative, for Adequate Protection ("Opposition to MFR"), and in its Opposition of JN Medical Corporation to Auro Vaccines, LLC's Motion to Dismiss the Chapter 11 Case ("Opposition to MTD"). (Eversden Declaration, Exhibit 14, Opposition to MFR, p. 3, ¶¶ 12, 14; Eversden Declaration, Exhibit 15, Opposition to MTD, p. 3, ¶¶ 12, 14).
42. The Debtor has proposed a reorganization plan that relies on a proposed licensing deal with a company known as JP Vaccines, LLC ("JP"), in which JP
*888 would license the Debtor's intellectual property for an up-front payment of $ 5 Million, plus ongoing royalties. (Eversden Declaration, Exhibit 10, Amended Disclosure Statement Proposed by JN Medical Corporation ("Disclosure Statement and Plan") ). The Debtor's Disclosure Statement has been approved since November 17, 2017 (Doc. 1, Exhibit 3, p. 52). The Debtor has taken no steps to obtain confirmation of its plan. (See Bankruptcy Case Docket).
Filing No. 19, at 1-8.
The Debtor offers the following undisputed facts:
1. On February 15, 2017 (the "Petition Date"), the Debtor filed its voluntary petition for relief under Chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for the District of Nebraska (the "Court"). See In re JN Medical Corporation , No. 17-80174 (Bankr. D. Neb. filed February 15, 2017) (hereafter, the "Bankruptcy Proceeding"), Filing No. 1.
2. On June 1, 2017, Defendant filed a proof of claim, entered into the claims register as Claim No. 6 ("Defendant's Claim") of Bankruptcy Proceeding, in which Defendant represented that it is owed $ 3,586,629.73 by Debtor. A copy of the Claim is attached as Exhibit A to the Declaration of Patrick R. Turner ("Dec. of PRT").
3. Defendant asserts that Defendant's Claim is fully secured. Dec. of PRT, Ex A.
Background, The Loan, and its History
Loan Documents and History
4. Debtor through its then-CEO, Dr. Jeeri Reddy ("Reddy"), entered into that certain Loan, Guaranty and Security Agreement, dated as of June 30, 2014 (the "Loan Agreement") with Full Circle Capital Corporation ("Full Circle"), pursuant to which Debtor borrowed the principal amount of $ 3,500,000 (the "Loan"). Dec. of PRT, Exhibit B, Pages 9-58.
5. The Loan Agreement does not provide for a payment schedule. Rather, the Loan Agreement provides that, the "entire unpaid balance of the Term Loan and all Obligations shall be due and payable on the Maturity Date." See Dec. of PRT, Exhibit B, § 2(b), Page 17.
6. In turn, the Maturity Date under the Loan Document was "the first Business Day date that is two (2) years after the Closing Date." See Dec. of PRT, Exhibit B, Schedule # 7, Page 53.
7. By its terms, the Note was set to mature in late June or early July 2016. Nevertheless, the Loan Agreement provided Debtor with the opportunity to extend the Maturity Date for a period of 12 months under certain conditions. See Dec. of PRT, Exhibit A, § 2(b), Page 53-54.
8. To evidence its obligations under the Loan, Debtor is the maker of that certain Term Loan Note dated June 30, 2014 (the "Note"). See Dec. of PRT, Exhibit C.
9. The Note neither states a rate of interest nor a specific payment date. See Dec. of PRT, Exhibit C.
10. In order to secure their obligations under the Loan, the Loan Agreement contains a grant of a security interest in favor of Full Circle in certain personal property of Debtor (the Personal Property"). See Dec. of PRT, Exhibit B, § 5, Page 25.
*889 11. In order to further secure its obligations under the Loan, Debtor executed that certain Deed of Trust, Assignment of Leases and Rents, Security Agreement and Fixture Filing dated June 30, 2014 (the "Deed of Trust") and related to Debtor's real property (the "Real Property"). See Dec. of PRT, Exhibit D.
Alleged Loan Default and Negotiations with Full Circle
12. On or about August 16, 2016, Full Circle conducted a foreclosure sale (the "Foreclosure Sale") of the Real Property pursuant to the Nebraska Trust Deed Act. Dec. of PRT, Exhibit E, ¶¶ 19, 57.
13. Full Circle was the successful bidder at the Foreclosure Sale submitting a credit bid of $ 1,500,000.00. Dec. of PRT, Exhibit E, ¶ 19.
14. Full Circle did not file deficiency action against Debtor within 3 months after the Foreclosure Sale. Dec. of PRT, Exhibit E, ¶ 58
15. In late 2016, Full Circle was acquired by an entity called Great Elm Capital Corp. ("Great Elm"). Dec. of PRT, Exhibit E, ¶ 21.
16. Great Elm asserts to have acquired all of its rights and interests under the Loan and Loan Agreement from Full Circle by operation of law pursuant to the merger of Full Circle with and into Great Elm, under that certain Agreement and Plan of Merger, dated as of June 23, 2016, between Full Circle and Great Elm (the "Full Circle Agreement"), which was effective, upon information and belief, on November 3, 2016. Dec. of PRT, Exhibit E, ¶ 22.
17. Defendant is not an original party to the Loan Agreement. Dec. of PRT, Exhibit E, ¶ 23.
18. Defendant asserts to have acquired all of its rights and interests under the Loan Agreement from Great Elm pursuant to that certain Asset Purchase Agreement dated February 3, 2017 (the "Purchase Agreement") and that certain Assignment and Assumption Agreement dated February 3, 2017 (the "Assignment Agreement"). Dec. of PRT, Exhibit E, ¶ 24.
19. Under the terms of the Purchase Agreement, Defendant paid Great Elm $ 1,500,000.00 for title to the Real Property and $ 1,500,000.00 for the Loan and other loan documents. Dec. of PRT Exhibit B, Page 61, § 1.02(a-b).
20. As part of the Loan Agreement, Full Circle irrevocably appointed an agent to administer the Loan. Dec. of PRT Exhibit B, § 17(a), Page 49.
21. More specifically, the Loan Agreement provides that, "Lender hereby designates and appoints [Full Circle] as its 'Agent' under this Agreement and the Loan Documents, and Lender hereby irrevocably authorizes Agent to take such action or to refrain from taking such action on its behalf under the provisions of this Agreement and the Loan Documents and to exercise such powers as are set for herein or therein, together with such other powers as are reasonably incidental thereto." Dec. of PRT Exhibit B, § 17(a), Page 49.
22. Other than the right to terminate the Loan and declare the unpaid balance immediately due and payable (which resided with the lender), all other rights and remedies in the event of a default under the Loan Agreement are exercisable only by the Agent irrevocably appointed by Full Circle. Dec. of PRT Exhibit B, § 13(b)(i-ix), Page 36-37.
23. Also under the Loan Agreement, the "Agent" may "resign from the performance *890 of all its functions and duties hereunder at any time by giving at least thirty (30) Business Days' prior written notice to [Debtor] and Lender. Such resignation shall take effect upon the acceptance by a successor Agent of appointment pursuant to clause (ii) below ...". Dec. of PRT Exhibit B, § 17(d), Page 50.
24. In turn, after notice of the resignation of an Agent, the Lender shall, "upon receipt of [Debtor's] prior consent which shall not unreasonably be withheld, appoint a successor Agent." Dec. of PRT Exhibit B, § 17(d), Page 50.
25. Neither Full Circle nor Great Elm provided written notice of its resignation as the Agent to Debtor thus triggering the 30 business day clock; and (ii) Debtor did not consent to the appointment (and does not now consent) of Defendant as Agent under the Loan Agreement. Declaration of Kevin Aramalla, ¶ 9-12 ("Dec. of KA").
26. Moreover, under the terms of the Purchase Agreement, the execution and delivery thereof did not and would not "conflict with or result in ... any violation of, or default under the Loan Documents ..." except as provided for in Schedule 3.02(c). Dec. of PRT Exhibit B, § 3.02, Page 63.
27. Schedule 3.02(c) provides, "[t]o the extent deemed a breach, violation or default under Section 17 of the Loan Agreement, resignation of the Existing Agent under the Loan Agreement and appointment if a replacement Agent under the Loan Agreement, in each case, as contemplated under the Assignment and Assumption Agreement." Dec. of PRT Exhibit B, Page 74.
28. Defendant's Claim and exceeds the value of the estate. Dec. of PRT, Exhibit F, Sec. A, Page 4-5.
29. Defendant has asserted that Debtor's assets are of nominal or unknown value. Dec. of PRT, Exhibit F, Sec. B(1)(c), Page 20.
Filing No. 22, at 1-5.
DISCUSSION
The parties have filed cross motions for summary judgment. Auro contends that Debtor's claim is baseless and argues the Debtor is attempting to gain a windfall of several million dollars for the Debtor's shareholders.
Count 1 - Perfected Security Interest, Including Patents
Auro first contends that as a matter of law it has a valid and perfected security interest in the Debtor's intellectual property, including the patents, that cannot be avoided. Article 1 of the Purchase Agreement, argues Auro, clearly confirms that Auro purchased Great Elm's secured loan and security interests in the patents and inventions. Filing No. 18, # 15, Ex. H to Amended Complaint (Purchase Agreement, pp. 1-2, Section 1.01(b) ). The Debtor relies on Section 3.04(f) of the Purchase Agreement to argue otherwise. Id. at 5-6. However, Auro contends this section only deals with representations and warranties. It deals with that which Great Elm is representing and warranting to Auro as a first priority security interest. Auro contends that the Purchase Agreement, Article I, states that "all of Seller's right, title and interest in the Loan, including all security interests, mortgages, assignments, UCC financing statements, collateral assignments, indemnities, agreements and any and all other written instruments or documents evidencing, securing, perfecting or otherwise pertaining to the Loan," exist without any exceptions. Id. at 1-2, Section 1.01(b). Included *891 in the assignment in Section 5(A)(i) of the Loan Agreement containing General Intangibles, is language which includes "patents and patent applications." Filing No. 18, Attach. 8-A, Loan Agreement, p. 15, 49, Sec. 1, 5(a)(i), (viii), and Schedule 19A. See Neb. Rev. Stat. UCC § 9-102, comment 5(d) ("Examples [of general intangibles] include various categories of intellectual property"); In re Phoenix Systems & Components, Inc. , 2007 WL 6444551 (Bankr. D. Neb. 2007) (general intangibles include patents).
In addition, Auro points to its Original Financing Statement filed in 2014 which also expressly covers "general intangibles" and "patents and patent applications." (Amended Complaint, p. 4, ¶ 21; Filing No. 18, Attach. 35, Ex. 11 J, UCC Financing Statements, Sec. (g), (p) ). The financing statement was perfected at all times contends Auro.
The Court has carefully reviewed the Purchase Agreement as well as the supporting documents. The Court finds that the original documents clearly encompass general intangibles, including patents and patent applications. The section of the Purchase Agreement relied upon by Debtor clearly focuses on representations and warranties, not on the particulars of the purchase. In fact, the preamble in Article III specifically states: "Seller represents and warrants to Buyer that the statements contained in this Article III are true and correct as of the date hereof." Filing No. 18, Attach. 15, Ex. H, Purchase Agreement, Art. III (Representations and Warranties). On the other hand, the Sections relied on by Auro in both the Purchase Agreement as well as the original Financing Statement include general intangibles and patents. Article I of the purchase agreement clearly states that this is a secured loan and is entitled "PURCHASE AND SALE".Id. at Article 1. The Purchase Agreement includes "all of Seller's right, title and interest in the Loan, including all security interests, mortgages, assignments, UCC financing statements, collateral assignments, indemnities, agreements and any and all other written instruments or documents evidencing, securing, perfecting or otherwise pertaining to the Loan," without any exceptions. Id. , Purchase Agreement, Section 1.01(b). Also included is the assignment of the security interest granted to Auro. Filing No. 18, Attach.10-C, Security Agreement, pp. 2-4, Section 1.1(g), (p). The Court finds the contractual language clearly includes general intangibles and patents, and such was assigned to Auro by Great Elm via the Purchase Agreement, the Security Agreement and the Loan Agreement. The Court finds that Auro is entitled to a judgment as a matter of law on this issue.
Count II - UCC Amendments
Debtor argues in Count II that the Auro UCC Amendments constitute an avoidable preferential transfer under 11 U.S.C. § 547, contending that either Auro did not purchase from Great Elm a security interest in the intellectual property, or Auro waived its security interest in the intellectual property. See Amended Complaint, p. 11, ¶¶ 75, 76. The Debtor argues that Auro did not already have a perfected security interest in his intellectual property at the time Auro's UCC Amendments were filed. Thus, such amendments would constitute an antecedent debt within 90 days before the bankruptcy, allowing Auro to recover more than it would have recovered in a pure Chapter 7 distribution.
This claim, contends Auro, is without merit, because no transfer of the Debtor's property occurred. The security interest *892 pursuant to the Loan Agreement and Security Agreement, contends Auro, covers the patents as previously discussed. This security agreement was continuously perfected from the time of the original financing statement in 2014, and there was no transfer of an interest of the Debtor within that 90-day time period. See 11 U.S.C. § 547(e) (transfer is made "at the time the transfer takes effect between the transferor and the transferee, if such transfer is perfected at, or within 30 days after, such time, ...").
The Court finds the Debtor's claim is without merit. First, the Court agrees that Auro is correct that there was no transfer of property as a result of the Auro UCC Amendments. This was property belonging to Auro. See In re El Paso Refinery, LP , 171 F.3d 249, 254-55 (5th Cir. 1999) ( Section 547(b)(5) is not met "[e]ven if the payment in question was applied to the unsecured portion of an undersecured creditor's claim, the creditor will not be deemed to have received a greater percentage as a result of the payment if the source of the payment is the creditor's own collateral. A creditor who merely recovers its own collateral receives no more as a result than it would have received anyway had the funds been retained by the Debtor, subject to the creditor's security interest.)." As stated herein, the Loan Agreement and Security Agreement already covered the general intangibles, including patents. Debtor granted Full Circle these rights in June 30, 2014, and the documents were perfected on July 7, 2014. These rights then proceeded to Great Elm and then to Auro. Loan Agreement, p. 18, Section 5(a)(i); Security Agreement, p. 4-5, Section 1.1(g); Original Financing Statement; UCC Filings. Filing No. 18, Exs. 5, 8, 9, 20, 21; 10 and 17; and 14, 17, 18 and 35. For all of the following reasons, there is no preferential transfer: the alleged security interest transfer to Auro occurred before the ninety-day preference period; in any event there was no actual transfer of an interest of the Debtor in any property; Full Circle's security interest was perfected in June of 2014, and a mere change in information about a secured party does not render the financing statement as misleading. See Neb. Rev. Stat. UCC § 9-507(b) ; 11 U.S.C. § 547(b)(5). Accordingly, the Court finds that Auro is entitled to judgment as a matter of law on Count II.
Count III - Rev. Neb. Stat. § 76-1013
Debtor first requests that this Court grant it a declaratory judgment, contending that Auro is barred from asserting a claim against the it. Debtor contends that Auro only had three months to bring a deficiency against a borrower following a non-judicial foreclosure under the Nebraska Trust Deed Act. Section 76-1013"establishes the limitations period for an action to recover a deficiency on any obligation, such as a promissory note or other contract, after sale of the real estate which secured the obligation pursuant to the Nebraska Trust Deeds Act." Bank of Papillion v. Nguyen, 252 Neb. 926, 932-33, 567 N.W.2d 166 (1997). The Debtor asks the Court to enter a declaratory judgment finding that the claim filed by Auro in this case is barred by Neb. Rev. Stat. § 76-1013. This statutory section states that "an action may be commenced to recover the balance due upon the obligation for which the trust deed was given as security...." Neb. Rev. Stat. § 76-1013. Debtor in short argues that the defendant commenced an "action" by filing this lawsuit in this Court after the expiration of the Nebraska anti-deficiency statute *893 of limitation, which, argues Debtor, was not tolled by Debtor's bankruptcy filing.
Thus, Debtor urges this Court to find that defendants action and claims are barred under Nebraska law. See Melikian Enterprises, LLLP v. McCormick , 863 F.3d 802 (8th Cir. 2017) (bankruptcy court was required to "determine the amount of [a creditor's] claim" pursuant to 11 U.S.C. § 502 but must do so by "consult[ing] state law") id. at 807 (citing Travelers Casualty & Surety Co. of America v. Pacific Gas & Electric Co. , 549 U.S. 443, 450, 127 S.Ct. 1199, 167 L.Ed.2d 178 (2007) ); In re Gatewood , 533 B.R. 905, 908 (8th Cir. BAP 2015) (quoting Lewallen v. Green Tree Servicing , L.L.C. , 487 F.3d 1085, 1091 (8th Cir. 2007) ). As such, argues Debtor, it is entitled to summary judgment on defendants' claims in their entirety.
As pointed out by Auro, however, the Nebraska Supreme Court recently addressed and determined this issue.[3] In Doty , the Nebraska Supreme Court limited the application of § 76-1013 to "actions" to recover a deficiency judgment, specifically holding that § 76-1013 did not prohibit a creditor from enforcing its "liens upon or security interests in other collateral given to secure the same obligation." Doty v. West Gate Bank, Inc. , 292 Neb. 787, 800, 874 N.W.2d 839 (2016) ("In this appeal, we are asked to determine whether the 3-month statute of limitations set forth in the Nebraska Trust Deeds Act (Act) bars a bank from foreclosing on the bank's remaining collateral. We conclude that it does not. Our conclusion is consistent with the plain language of the Act, our previous interpretations of the same language, and the decisions in other states under similar provisions. We therefore reverse, and remand with directions." Id. at 788-89, 874 N.W.2d 839. Auro argues that Doty clearly determined that "other matters", such as the filing of a proof of claim, fall outside of the definition of "action"[4] under § 76-1013, and thus, Auro is not barred by § 76-1013.
The Court agrees that Auro's secured claim is unaffected by Neb. Rev. Stat. § 76-1013 and adopts the definition of "action" as defined and discussed in Doty . An extension of Doty as suggested by the Debtor would severely curtail the rights of many creditors. Further, the Court finds the Melikian case cited by Debtor is likewise not helpful. The Court in Melikian addressed an issue under Arizona law where the deficiency statute was different than the Nebraska statute. The Court agrees Melikian is not applicable. Likewise, the Court finds that Gatewood is not helpful to the Debtor either. The Court notes that Gatewood is a Fair Debt Collection Practices Act and is not on point with the case at hand. The Court concludes that § 76-1013 does not bar Auro's claim in this case.
Further, in the alternative, the Court finds that Auro has a valid deficiency claim in any event. Nebraska Revised Statutes § 25-216 provides in relevant part: "In any cause founded on contract, when any part of the principal or interest shall have *894 been voluntarily paid, or an acknowledgment of an existing liability, debt or claim, or any promise to pay the same shall have been made in writing, an action may be brought in such case within the period prescribed for the same, after such payment, acknowledgment or promise; ...." After a foreclosure in this case, the Debtor signed an acknowledgement of its liability on the loan and signed a Forbearance Agreement admitting to the same. Filing No. 18, Attach. 23, Ex. 2. He acknowledged his default; the original principal amount of $ 3,5000,000.00; and agreed to forbear any defenses. Id. , p. 1-2. In January of 2017, the Debtor through his counsel again acknowledged this debt. Filing No. 18, Attach. 25, Ex. 4. Moss Messages. Further, the Debtor filed multiple court documents acknowledging this indebtedness.
All of these circumstances, contends Auro, serve to restart any argument that the statute of limitations has passed on the underlying obligation. See Rolfe v. Pillond , 16 Neb. 21, 19 N.W. 970 (1884) (letter to guarantor in which debtor acknowledged the debt and promised to reimburse guarantor held sufficient to take guarantor's claim out of the statute of limitations). "[N]o set phrase or particular form of language is required. Anything that will indicate that the party making the acknowledgment admits he is still * * * held for its liquidation and payment is sufficient to revive the debt or claim." Bucker v. Korff's Estate , 97 N.W. 804 (Neb. 1903).
The Court finds that in the alternative the Debtor revived the debt. The Debtor signed the Forbearance Agreement; the attorney letters from Moss acknowledge the existence of the debt with a promise to pay; and the Debtor agreed in court filings that he owes the debt. For these reasons, as stated herein, the Court finds the summary judgment filed by the defendant will be granted as a matter of law as to Count III.
Count IV - Plausible claim
Auro contends that there are no claims for relief in Count IV of the Amended Complaint. Labels and conclusions are insufficient. Bell Atlantic Corp. v. Twombly , 550 U.S. 544, 555, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007). The Court has carefully looked at Count IV of the Amended Complaint and agrees with the arguments set forth by Auro. The Amended Complaint shows that the Loan Agreement was executed, security interests granted and perfected, and that the loan and the rights thereunder transferred to Auro. There is nothing in Count IV that sets forth any new claims, other than the ones set forth in the other claims of the Amended Complaint. The Court finds that Count IV does not state a cause of action and cannot withstand the motion for summary judgment.
Agency/Standing
The Debtor next argues that Auro does not have standing to pursue its rights under the Loan agreement, because Auro is not the "Agent" under the terms of the agreement. Auro disagrees contending it is the Agent under the Loan Agreement. Debtor contends that Full Circle never properly resigned its agency, never properly appointed a successor agent, and thus Full Circle remains the agent under the Loan Agreement. Thus, only Full Circle can enforce the Loan Agreement. Therefore, argues Debtor, defendant lacks standing to pursue this claim.
*895 Section 16(e) of the Loan Agreement provides that Great Elm has the right to transfer the rights and powers of "Agent" under the Loan Agreement to Auro, without any requirement that it consult or give notice to the Debtor. Filing No. 18, Attach. 8, Ex. A, Loan Agreement, Sec. 16(e). Additionally, the Debtor has no rights under Section 17, where in it states the provisions of "Section 17 are solely for the benefit of the Agent and Lender" and section 16(e) states "notwithstanding anything herein to the contrary Agent and Lender may, without the consent of Borrower or any other Loan Party, grant a security interest in, sell or assign, grant or sell participations or otherwise transfer all or any portion of its rights and obligations hereunder and/or under one or more other Loan Documents to one or more other Persons." in the Loan Agreement. Id. at § 17(a). Further, as stated in the Assignment Agreement:
To the extent that the appointment of [Auro] as Agent is not contemporaneous with the Effective Date [February 3, 2017], then [Great Elm] shall, and hereby does, appoint [Auro] as its exclusive agent, authorized and empowered solely to act in [Great Elm's] behalf as Agent under the Loan, and [Great Elm] hereby delegates to [Auro] all rights of the Agent under the Loan.
Filing No.18, Attach. 15, Ex. I, Assignment Agreement, Sec. 3(b).
The Court finds the language is clear. Section 16(e) allows Great Elm to transfer the rights and powers of "Agent" under the loan agreement. It says nothing about consulting or notifying the debtor. Filing No. 18, Attach. 8, Ex. A, Loan Agreement, Sec. 16(e). This section also allows the Agent or Lender:
without the consent of Borrower (i.e., the Debtor] or any other Loan Party, grant a security interest in, sell or assign, grant or sell participations or otherwise transfer all or any portion of its rights and obligations hereunder and/or under one or more other Loan Documents to one or more other Persons.
Id. Further, the Court agrees that section 17 is solely for the agent and the lender and is not intended to benefit the debtor. Additionally, Section 16 is specific to the Loan Agreement. Loan Agreement, § 17(a) (explaining that provisions of "Section 17 are solely for the benefit of Agent and Lender"). Id. Further, as stated in the Assignment Agreement:
To the extent that the appointment of [Auro] as Agent is not contemporaneous with the Effective Date [February 3, 2017], then [Great Elm] shall, and hereby does, appoint [Auro] as its exclusive agent, authorized and empowered solely to act in [Great Elm's] behalf as Agent under the Loan, and [Great Elm] hereby delegates to [Auro] all rights of the Agent under the Loan.
Filing No. 18, Attach. 15, Ex. I, Assignment Agreement, p. 12, Sec. 3(b). Thus, this provision makes clear that even if Auro had not formally become the successor agent, it was empowered to act as the agent. The Court finds that the language of the documents grants the right of Agent to Auro. In the alternative, the Court concludes that the language empowered Auro to act as the agent of the Agent.
Post-petition interest, default interest, attorneys' fees, and expenses
Auro asks for post-petition interest, default interest, attorneys' fees, and expenses. The Debtor argues that Auro is not entitled to such recovery under 11 U.S.C. § 506(b) of the Bankruptcy Code. The Debtor, however, does not make a *896 strong, specific argument as to why these fees and expenses are not allowed. Further, as argued by Auro, such amounts are recoverable where the value of the collateral is more than the amount of the claim. See 11 U.S.C. § 506(b) ("To the extent that an allowed secured claim is secured by property the value of which, after any recovery under subsection (c) of this section, is greater than the amount of such claim, there shall be allowed to the holder of such claim, interest on such claim, and any reasonable fees, costs, or charges provided for under the agreement or State statute under which such claim arose."); see In re White , 260 B.R. 870, 879 (8th Cir. BAP (Neb.) 2001) ( Section 506(b)"entitles the holder of an over-secured claim to post-petition interest and, in addition, gives one having a secured claim created pursuant to an agreement the right to reasonable fees, costs and charges provided for in that agreement"). Further, the loan agreement allows for such recovery. Filing No. 8, Attach. Ex. A, Loan Agreement, p. 30, Sec. 13(b)(viii);[5] Filing No. 18, Attach. 10, Ex. C, Security Agreement, Sec. 1.3. Section 3(a) of the Loan Agreement, states: "Borrower will pay Lender interest on the average daily principal amount of the Term Loan outstanding hereunder, calculated monthly and payable in arrears on the first day of each calendar month...." Filing No. 8, Attach. Ex. A, Loan Agreement § 3(a). With respect to post-petition interest, Debtor contends that § 506 only allows this if there is excess value of the collateral. Debtor argues that once the prepetition claim exceeds the amount of the claim it secures, "post-petition interest ceases to accrue." Matter of Bradley , 94 B.R. 563, 567 (Bankr. N.D. Iowa 1988). The "burden of proving the amount of its claim to post-petition interest by demonstrating to what extent, and for what period of time, its claim was over-secured." Id. at 568-69. Auro argues, and the Court agrees, that it is too soon to make a decision in this regard. A claim will be made more appropriately, at a sale pursuant to 11 U.S.C. § 363. The Court finds that Auro is entitled to post-petition interest, and the sum will be determined at a later date, depending on the sale of the assets or other such agreement, as the bankruptcy action proceeds.
With respect to post-petition attorney's fees, the Court must first look to *897 the reasonable and prudent actions and should consider the factors set forth by the Eighth Circuit. Winter v. Cerro Gordo County Conservation Board , 925 F.2d 1069, 1074, n. 8 (8th Cir. 1991).[6] The Court finds that Auro is entitled to attorneys' fees. See 11 U.S. C. 506(b) ; In re White , 260 B.R. at 879. Debtor claims Auro has nearly $ 750,000 work for fees that are not itemized. The Court again finds that deciding at this juncture as to the amount of a fee is premature. Again, the parties have no evidence that Auro will in fact be over-secured. The Court concludes that Auro is entitled to recover post-petition interest, default interest, and attorneys' fees under 11 U.S.C. § 506(b). The parties can make claims and defenses and brief these issues, if necessary, at the appropriate time in bankruptcy court.
Pre-petition default interest, post-petition rent, loan agreement agency
Debtor contends that a request for pre-petition default interest is wrongfully assessed, as no payments were due under the loan at the time of the assessment. Auro argues this is not accurate, as it is entitled to assess default interest prior to the maturity date of the loan. See In re Bohling , 222 B.R. 340 (Bankr. D. Neb. 1998) (In a Chapter 11 confirmation, an over-secured creditor is entitled to interest at the default rate under 11 U.S.C. § 1123(d) ); In re Moody Nat. SHS Houston H, LLC , 426 B.R. 667 (Bankr. S.D. Tex. 2010) ( § 1123(d) includes a requirement to pay default interest). The Court agrees. The evidence presented to the Court shows that the Debtor admitted it was in default; signed a Forbearance Agreement admitting its default; reaffirmed that default in a letter from Great Elm's counsel in May 2016; and was provided an opportunity to cure the default prior to the foreclosure proceedings.
The Debtor also contends that Auro is not entitled to a priority claim for post-petition rent.[7] Auro contends that the rent expense occurred post-petition, and the Debtor occupied the real property from and after the petition date. The Debtor also stored its assets on this property. Debtor contends there was no lease, so it owes no money.
The Loan Agreement required that the Debtor pay interest the first of each month. Filing No. 8, Attach. Ex. A, Loan Agreement, Sec. 3(a). The Debtor *898 failed to make those payments to Full Circle. The Debtor signed the Forbearance Agreement and was provided with an opportunity to cure the default prior to foreclosure. Upon default, the Loan Agreement obligated the Debtor to pay an increased rate of interest (hereinafter the "Default Interest") (Filing No. 8, Attach. Ex. A, Loan Agreement, Sec. 3(c) ). See In re Bohling , 222 B.R. 340 (Bankr. D. Neb. 1998) (In a Chapter 11 confirmation, an over-secured creditor is entitled to interest at the default rate under Sections 1123(d) ); In re Moody Nat. SHS Houston H, LLC , 426 B.R. 667 (Bankr. S.D. Tex. 2010) ( § 1123(d) includes a requirement to pay default interest). The Court concludes as a matter of law that Auro is entitled to recover for pre-petition default interest.
The Court also finds as a matter of law that Auro is entitled to recover for post-petition rent. See 503(b)(1) (allowance of administrative expenses and other claims including costs and expenses of preserving an estate); "[A]n administrative claim will be allowed [under Section 503(b)(1) ] when the expense (1) arises post-petition; and (2) is beneficial to the Debtor's estate. In re Lease-A-Fleet, Inc. , 140 B.R. 840, 845 (Bankr. E.D. Pa. 1992). It is clear that the rent expense rose prior to the filing of the petition in bankruptcy; the cost was beneficial to the estate, as Debtor could store the assets; the lack of an express lease is irrelevant, as under Nebraska law: "[t]he occupancy of premises by one person with the consent or permission of the owner, or with the consent of the person entitled to assert a right to the possession of the premises, creates between the parties the relation of landlord and tenant, and in the absence of an agreement or circumstances indicating a contrary intent, the law will imply an agreement on the part of the tenant to pay the reasonable value of his use and occupation." Ryan v. Nelson , 177 Neb. 130, 134, 128 N.W.2d 592, 594 (1964) (quoting 32 Am.Jur., Landlord and Tenant, § 430, p. 349) ; see also Skinner v. Skinner , 38 Neb. 756, 57 N.W. 534, 537 (1894) ("[T]he law, in the absence of all evidence to the contrary, will imply the existence of the relation of landlord and tenant between two parties, where one owns land, and by his permission it is used and occupied by the other ... [I]f the tenant's use and occupation has been beneficial to him, that is sufficient ground from which to imply a promise on his part to pay a reasonable compensation for such use and occupation, in the absence of any evidence negativing such promise"). Accordingly, the Court finds that Auro is entitled to make a claim for post-petition rent.
THEREFORE, IT IS ORDERED THAT:
1. The Debtor's motion for partial summary judgment, Filing No. 20, is denied;
2. Defendant's motion for summary judgment, Filing No. 17, is granted.
3. The Court finds that Auro is entitled to file claims for post-petition interest, default interest, attorneys' fees, pre-petition default interest, and post-petition rent.
4. A separate judgment will be entered in conjunction with this memorandum and order.

The Amended Complaint, as filed in the Bankruptcy Court, is filed in the Index of Evidence accompanying the Defendant's Motion. The Exhibits to the Amended Complaint were all originally filed in the Bankruptcy Court as a single pdf. For ease of reference, Auro has split the Exhibits into separate pdfs and has attached them separately to the Eversden Declaration in the Index of Evidence.

All further references to the "Note" herein will be to the promissory note, as endorsed. (Amended Complaint, Exhibit N).

See Butner v. U.S. , 440 U.S. 48, 55, 99 S.Ct. 914, 59 L.Ed.2d 136 (1979) ("Property interests are created and defined by state law. Unless some federal interest requires a different result, there is no reason why such interests should be analyzed differently simply because an interested party is involved in a bankruptcy proceeding.").

The Court defined "an action" as "suits resting upon a complaint and filed in court." Doty , 292 Neb. at 795, 874 N.W.2d 839.

Agent may, and at the direction of the Lender, shall, exercise any of the remedies available to Agent as a secured party under the Uniform Commercial Code as in effect in any applicable jurisdiction, or otherwise available to Agent under applicable law. Borrower agrees, upon Default and written notice thereof by Agent, to cease the sale or other disposition of the Collateral, except with Agent's prior written consent, and to assemble at Borrower's expense all the Collateral at a convenient place acceptable to Agent. Agent may charge to Borrower's loan account and Borrower will pay Agent upon demand all costs and expenses, including reasonable attorneys' fees (including fees of attorneys that are regular salaried employees of Agent or any of its Affiliates), in connection with: (A) the liquidation of any Collateral; (B) obtaining or enforcing payment of the Obligations; (C) the settlement, adjustment, compromise, or litigation of Customer disputes; or (D) the prosecution or defense of any action or proceeding either against Agent or Lender or against Borrower, concerning any matter growing out of or in connection with this Agreement and/or any Collateral and/or any Obligations. If at any time Agent pays any state, city, local, federal, or other tax or levy attributable to the Collateral, Borrower will repay to Agent the amount of tax so paid by Agent. Borrower agrees that Agent may apply any proceeds from disposition of the Collateral first to satisfy obligations secured by Liens prior to Agent's security interest. Borrower will remain liable and will pay on demand any deficiencies arising upon the liquidation of any Collateral held by Agent. Filing No. 8, Attach. Ex. A, Loan Agreement, p. 30, Sec. 13(b)(viii)

"In determining the amount of attorney's fees the court should consider these 12 factors: (1) the time and labor required; (2) the novelty and difficulty of the questions; (3) the skill requisite to perform the legal service properly; (4) the preclusion of employment by the attorney due to acceptance of the case; (5) the customary fee; (6) whether the fee is fixed or contingent; (7) time limitations imposed by the client or the circumstances; (8) the amount involved and the results obtained; (9) the experience, reputation, and ability of the attorneys; (10) the "undesirability" of the case; (11) the nature and length of the professional relationship with the client; and (12) awards in similar cases." Winter v. Cerro Gordo Cty. Conservation Bd. , 925 F.2d 1069, 1074 (8th Cir. 1991) (citing Hensley v. Eckerhart , 461 U.S. 424, 430 n. 3, 103 S.Ct. 1933, 76 L.Ed.2d 40 (1933) ).

Section 503(b)(1) of the Bankruptcy Code provides in relevant part:
(b) After notice and hearing, there shall be allowed, administrative expenses, other than claims allowed under section 502(f) of this title, including-
(1)(A) the actual necessary costs and expenses of preserving the estate....
"[A]n administrative claim will be allowed [under Section 503(b)(1) ] when the expense "(1) arises post-petition; and (2) is beneficial to the Debtor's estate." In re Lease-A-Fleet, Inc. , 140 B.R. 840, 845 (Bankr. E.D. Pa. 1992).